Linda H. WILLIAMS, Plaintiff,

v.

HOUSING AUTHORITY OF the CITY OF SANFORD, FLORIDA, a municipal corporation, Defendant.

No. 87–131–CIV–18.

United States District Court, M.D. Florida, Orlando Division.

June 28, 1988.

Robert E. Weisberg, Trial Counsel, David M. Lipman, Stefan Ruud, Lipman & Weisberg, Miami, Fla., for plaintiff.

James Sweeting, III, Perry & Lamb, P.A., Sanford, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

G. KENDALL SHARP, District Judge.

This sex discrimination action was tried before the court without a jury. Based upon the facts admitted by the parties in their joint pretrial stipulation, the testimony, and evidence admitted at trial, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

This action concerns the alleged failure to promote plaintiff Linda Williams, a black female, to the position of Executive Director of defendant, the Housing Authority of the City of Sanford, because of her sex. The Sanford Housing Authority (SHA), an independent state agency, is a low-rent public housing development, consisting of 480 units which house approximately 1500 persons in six projects, five multi-family and one elderly-handicapped. The overall administration of the SHA is based on the Department of Housing and Urban Development (HUD) guidelines.

The Executive Director is responsible to the five-member, policy-making SHA Board of Commissioners, who are appointed by the Sanford City Commissioners, and also serves as Secretary to the Board. During the relevant time period when plaintiff was considered for Executive Director, the five SHA Commissioners were: Joseph Caldwell, Chairman, black male; Eliza Pringle, Vice Chairperson, black female; Mary Whitney, Commissioner, black female; J. Wain Cummings, Commissioner, white male; and Leroy Johnson, Commissioner, black male. The testimony indicated that some of the Commissioners held certain allegiances among the Sanford black community, which the SHA serves predominantly. Although these loyalties were evident in their views and voting regarding candidates for Executive Director, preservation of the respectability in the SHA administration was their common goal.

Plaintiff originally was employed by SHA in January, 1972 as the Social Services Director. In this position, which she held until June, 1980, plaintiff essentially was the liaison between the residents and management. The undisputed testimony was that plaintiff performed this job efficiently and well.

From 1973 to 1980, Thomas Wilson, III, a black male, was the SHA Executive Director under whom plaintiff served as Social Services Director. After five years of supervising plaintiff, Wilson's February 6, 1978 review of her work describes her strongest point as "[a]bility to coordinate" and her weakest point as "[s]ometimes lets down." He viewed her as having "[g]ood ability," as being a "[d]efinite asset" to SHA, and as "greatly improved since last evaluation." In his December 3, 1979 performance appraisal of plaintiff for December 1, 1978 to November 30, 1979, Wilson's overall evaluation of plaintiff states that she was a "[g]ood conscientious employee," who accomplished assignments with "minimal difficulty." He also commented that "[a]bsentees due to physical illness somewhat slows her up from realizing full po-

tential, but, nevertheless, she performs professionally and delivers promptly."

In June, 1980, while Wilson was Executive Director, plaintiff was promoted to Deputy Director Housing Services of SHA. Plaintiff testified that her basic responsibilities remained the same and that she acquired some managerial functions, such as staff supervision and rent collections. She also served as acting Executive Director in the Executive Director's absence.

During Wilson's tenure as Executive Director from 1973 to 1980, he also was involved in the Seminole County Housing Authority as well as the community development Block Grant Program, sponsored by the City of Sanford and managed by SHA. On occasion, Wilson conducted all three programs from his SHA Executive Director's office. Plaintiff administered the SHA for Wilson, and she kept both the Block Grant Program and the SHA records, with the financial officer under her supervision.

The SHA Board of Commissioners became concerned regarding Wilson's administration of the Block Grant Program. He was criticized for irregularities in purchasing of property, and there were allegations that money for the Block Grant Program was being used to pay SHA employees. Plaintiff admitted that SHA employees, who should have been dealing with the public housing sector, were spending too much time on the Block Grant Program.

When the criticism became focused on the mismanagement of the Block Grant Program, the SHA Board of Commissioners fired Wilson. The Federal Bureau of Investigation investigated the Block Grant Program at the request of the Sanford City Manager. No one was charged. Following an audit of the Block Grant funds, the City Manager sent a memorandum, dated February 25, 1982, to plaintiff thanking her for reconstructing the accounts. The City Manager advised plaintiff that "I believe the Authority should take particuar [sic] note of this report as it shows the records[j] and practices of the Authority administration needs [sic] attention——critical attention!"

With the termination of Wilson, the SHA Board of Commissioners appointed Lewis B. Cox, a white and SHA financial officer, as Executive Director because of his strong accounting background with Stromberg–Carlson and its need to rectify SHA financial problems. Plaintiff testified that she did not feel discriminated against when Cox was made Executive Director because the Board of Commissioners employed him for his financial knowledge.

Under Cox as Executive Director, plaintiff's title changed to Director of Management because she was performing more management functions, and her salary increased. As Director of Management, plaintiff supervised the finance office, the maintenance superintendent, the bookkeeper, and the resident manager as well as selected tenants according to HUD guidelines. Plaintiff, however, answered directly to the SHA Board of Commissioners as Director of Management.

In his June 30, 1981 performance appraisal of plaintiff from July, 1980 to June, 1981, Cox found her to be "knowledgeable and concerned" about her job, receptive to responsibilities, and able to cope with pressure. He remarked that she had "strong potential for any management job." Cox voluntarily resigned as SHA Executive Director in July, 1981, because he and his family were moving out of state. By way of a July 13, 1981 letter, directed to the Joseph Caldwell, Chairman of the SHA Board of Commissioners, Cox made some suggestions to the Board for the future administration of SHA. One of these suggestions was that plaintiff be appointed Executive Director because of her capability and understanding of the circumstances under which SHA had been operating.

In their August 5, 1981 special meeting, pursuant to the departure of Cox as Executive Director, the SHA Board of Commissioners reviewed resumes, collected since the termination of Wilson. The minutes show that they decided to re-advertise the position locally and nationally "to allow interested and qualified persons a fair opportunity to apply." The commissioners

also agreed to appoint an Interim Executive Director.

The Board of Commissioners passed Resolution No. 636, which appointed plaintiff Interim Executive Director, at their August 13, 1981 meeting. Her salary was adjusted from $17,567.00, which she was earning as Director of Management, to $26,100.00. In addition to her retained responsibilities as Director of Management, plaintiff had management authority over all SHA operations, including occupation, maintenance and finances of the 480 units as well as the preparation of HUD reports and audits.

Plaintiff prepared and placed the advertisement for the Executive Director position in local newspapers and various public housing publications, including one of national circulation. The advertisement requested resumes for an individual who would be responsible for all phases of public housing, including planning, fiscal management, supervision and coordination of the 480 units, and who could implement Board policies. Additional criteria were management experience, preferably, a college degree, public housing certification or the acquisition thereof within the first year of employment, and familiarity with government (HUD) regulations was considered helpful.

Plaintiff testified that, shortly after she was appointed Interim Executive Director, Commissioner Pringle told her that what she was doing was like a principal's job and that it was "man's work." Eliza Pringle, who had retired from forty years of teaching school, was on the SHA Board from July, 1981 to 1984, during the relevant time when an Executive Director to replace Cox was being sought. She was not questioned regarding the alleged statement when she testified.

Plaintiff also testified that Commissioner Pringle said in August or September, 1981, that she wanted the applicants to send pictures so that she could tell whether they were male or female. This statement does not appear in the Board minutes and a picture is not requested in the SHA Executive Director advertisement admitted into evidence. Furthermore, at trial, Pringle convincingly testified regarding the apparently informal resume-review method, whereby the Commissioners passed the candidate resumes around the group. She testified that there was no special way to separate the resumes and that each resume was discussed. She recalled commenting that it would be "nice," given some of the non-gender names, if the applicants included pictures so that the correct form of address, Mr., Mrs. or Ms., could be used and that this was the only reason for her interest in the sex of the candidates.

At the December 17, 1981 SHA Board meeting, the Commissioners agreed to meet on Saturday, December 19, 1981 to interview the six candidates, including plaintiff, the only female candidate, and former Executive Director Wilson, for the Executive Director position. Following the interviews, the SHA Board met on January 7, 1982 for the purpose of appointing an Executive Director. Given the five commissioners, a three-vote majority was necessary for a candidate to be successful.

On the first and second ballots, plaintiff received the votes of Chairman Caldwell and Commissioner Whitney. The other three Commissioners voted for three different candidates, Thomas Wilson, III, Willie King, Sr., and Edward Sullivan. With no majority vote, the Commissioners agreed to caucus on January 16, 1982.

Although Commissioner Whitney was absent from the January 16, 1982 caucus meeting of the SHA Board, she cast her absentee ballot for plaintiff. Whitney testified that she thought that plaintiff was best qualified for Executive Director because she had handled multiple duties "very satisfactorily." The other four Commissioners discussed their reasons for supporting their respective candidates. Although Commissioner Pringle realized that Wilson had made mistakes in the past, she supported him because she did not think that the same problems were likely to occur in the future. While Pringle respected plaintiff and desired that plaintiff return to her former position as Director of Management, the minutes of the meeting state that

Pringle "intended to avoid personal feelings and family relationships."

At trial, Pringle testified that she did not support plaintiff because they were related, although the described relationship was removed and not immediate. Pringle testified that she told two other male applicants, distantly related or related by marriage that she could not support them for relationship reasons. It was Pringle's apparent understanding that no candidate could be related to a member of the SHA Board of Commissioners however distant that relationship might be. The SHA Personnel Policy states that "[t]he employment of more than one member of the same immediate family shall be avoided insofar as possible." Nepotism is defined as "the mother, father, sister, brother, mother-in-law, father-in-law, wife, husband, son, daughter or any other person residing in the employee's home."

Commissioner Johnson recognized that plaintiff and Wilson had more housing experience than the other applicants. Johnson, however, endorsed Willie King because of his Army experience and his lack of connection to past and present problems. Since he had no relatives or special interests to consider, Johnson indicated that he would vote for the candidate whom he thought was right for the job.

Commissioner Cummings stated that he had thoroughly reviewed the applications and that he had selected Edward Sullivan because he thought that he could do more for SHA. Cummings said that the only other candidate whom he would endorse was Willie King. He also stated that he would like to see plaintiff in her former position as Director of Management, although she had done the best that she could with her responsibilities.

Chairman Caldwell supported plaintiff because of her operational knowledge, her ability to work with the Commissioners, and her HUD familiarity and capability. Furthermore, SHA needed to reduce its administrative staff to six individuals. If plaintiff were appointed Executive Director, then Caldwell recognized that the housing management position could be eliminated because plaintiff had demonstrated her ability to do both jobs.

In the caucus discussions, related in the minutes of January 16, 1982 Board meeting, there was no discussion by the Commissioners of the applicants. Two ballots resulted in identical voting and no candidate received a majority as first choice. Willie King, however, received three votes as second choice by the Commissioners. The Commissioners set January 29, 1982 to consider again the permanent appointment.

At the January 29, 1982 SHA Board meeting, the voting was the same as the previous meeting with no candidate receiving a majority and plaintiff receiving the consistent votes of Caldwell and Whitney in the first-choice vote. With no second-choice vote cast by Pringle, the second choice of the other four Commissioners was Willie King. Because the first-choice votes had remained the same, Chairman Caldwell announced the appointment of Willie King, Sr. as Executive Director and the Commissioners unanimously endorsed the appointment. King, however, declined his appointment as Executive Director because of the political turmoil, and plaintiff continued as Interim Executive Director.

Plaintiff testified that Commissioner Whitney told her in January, 1982, that Commissioner Cummings had told Whitney that he preferred a man as the Executive Director, although he had no problems with plaintiff's interim administration. Whitney signed a February 1, 1982 statement, recounting that, during a Commissioners' session regarding appointment of an Executive Director, Cummings told her that plaintiff was a good Director of Social Services and Director of Management, but that the Executive Director position should be filled by a man because of the pressures. The statement is not sworn. Whitney testified that Cummings made the statement "probably" less than a week before the date of the statement that she signed. Although the statement was prepared for Whitney, she testified that she would not have signed it if it were not basically true.

Judy Wakly, SHA finance officer, testified that she attended Board of Commissioners' meetings, although her name does not appear in the minutes admitted into evidence. She further testified that, during the summer of 1981, Commissioner Cummings said "something to the effect" that he would rather see a band leader or a baseball coach as Executive Director than a woman. Commissioner Cummings did not testify at trial.

Cummings, however, did testify regarding his alleged sexually discriminatory comments at the October 31, 1985 administrative hearing conducted by the Florida Commission on Human Relations. His pertinent testimony, which was admitted into evidence, was the following:

Q   Okay.  Well, let me get to the heart of the matter.  Do you recall any consideration that you had concerning the circumstances of any particular applicant?  Did you prefer a man over a woman?

A   Never.

Q   Did you ever make such a statement?

A   No.  I just happened to have mentioned a couple of men that I preferred.

Q   Preferred in what regard?

A   Because of their experience.

Q   So, Ms. Whitney's statement to the contrary would be a statement you did not make?

A   That's right.

. . . .

Q   Did you review ... Do you recall if you reviewed her [plaintiff's] application or resume?

A   I read it myself.

Q   Did you evaluate it in terms of whether or not she could perform the job?

A   I've got to admit that I considered Ms. Williams as part of the prior problem that we had when Thomas Wilson was executive director, the problems with the budget—

. . . .

But there was a lot of money that couldn't be accounted for and I considered Ms. Williams a part of the Tom Wilson administration, and I would not vote for Tom Wilson to get his job back, therefore, under any considerations, I could not vote for Ms. Williams to take the same position because I considered her part of the original problem.

I don't think there is any way that she could have worked that close with Mr. Wilson and not known about some of these things.

. . . .

Q   ... I'm trying to find out if you recall hearing or being told or seeing it in writing some place that you made those particular comments that you thought that Ms. Williams had done a good job but that the job was a man's job and therefore you could not vote for her?

A   No, I never said that.

Q   Do you recall before I said that that someone else said that you said that?

A   I had heard that I had said that.  We were at a meeting one night when the press was there, and when I read in the paper the next day what I had said, it was like reading a very strange book, because half of the things that were in the paper was [sic] not said at the meeting by anyone that the press said said them.

I don't deal too much in gossip, but I was not prejudice [sic] to Ms. Williams because she was a woman.  I was not prejudice [sic] because she was black.  I made my choice because I felt that she was part of the original Tom Wilson problem.  And whether or not she was right or wrong, I still was....  The acquiescence was still there.

Administrative Hearing in *Linda H. Williams v. Housing Authority of the City of Sanford*, Case No. 84–2640, Oct. 31, 1985, before the Division of Administrative Hearings of the Florida Commission on Human Relations at 102, 106, 107–08.

At the March 5, 1982 SHA Board of Commissioners meeting, King's letter declining his appointment as Executive Director was read. Commissioner Whitney proposed that plaintiff be appointed Executive Director, since she had done a good job as Interim Executive Director. Commissioner Cummings, however, stated that the Board should proceed with meeting the "finding requirements" for the position. Chairman Caldwell observed that Commissioner Pringle was absent and that the appointment of an Executive Director should be made with all Board members present.

On September 29, 1982, the SHA Board of Commissioners held a special meeting for the purpose of interviewing candidate Elliott L. Smith, a black male and coordinator of the Comprehensive Employment and Training Program (C.E.T.A.) Youth Employment Program, for Executive Director and attempting to make an appointment. Smith had a college degree. His managerial experience included coordinator of C.E.T.A., a federal grant program, for the Seminole County School Board in Sanford.

Chairman Caldwell presented the list of recently interviewed candidates, including plaintiff, and took a vote. Smith received three votes; plaintiff, one; and candidate J.W. Henry, one. Smith was appointed Executive Director with his official duties commencing on October 11, 1982, at a salary of $24,380.00. Plaintiff was commended for combining two positions during her interimship, which had saved SHA money.

Chairman Caldwell advised plaintiff that she would resume her position as Director of Management. Plaintiff testified that her salary was reduced to $19,500.00. She testified that she trained Smith for six months, after which she took a three-month leave of absence. At the time of trial, plaintiff held the position of SHA Director of Management. She testified that she had received raises and that her salary was $24,000.00.

Regarding credentials for the Executive Director position, both plaintiff and Smith had college degrees. Smith became certified as a public housing manager within his first year as Executive Director. The criteria for this certification relate to education, experience and knowledge as well as a test, which Smith took. Plaintiff testified that she was "grandfathered" in the position of Interim Executive Director. Before the test became a requirement, an individual, such as plaintiff, could meet the minimal requirements of experience with the agency, education and good moral conduct. The court finds that both plaintiff and Smith met the stated, advertised requirements for SHA Executive Director.

Additionally, the court notes that the SHA Personnel Policy includes nondiscrimination as one of its basic principles:

*Nondiscrimination*–There shall be no discrimination against employees or applicants for employment on account of race, creed, color, national origin, sex, or any political or union affiliation.

With respect to changes in employment status, the Personnel Policy states in pertinent part:

*Promotions*–Vacated or newly established positions shall be filled to the fullest extent consistent with efficient operations, by the promotion of qualified employees.

*Demotions*–An employee shall be subject to demotion under the following conditions:

. . . .

2. If his position has been abolished or reallocated to a lower paying class and he cannot be transferred to a position of equal pay, it shall be clearly indicated in the employee's confidential file that the transfer in no way reflects the employee's performance or ability.

It appears to the court that plaintiff's changes in employment status were in accordance with SHA stated policies.

The testimony and admitted evidence showed that plaintiff was qualified for the position of Interim Executive Director. That position, by definition, was a temporary one. When a majority vote by the Commissioners determined a permanent

Executive Director, plaintiff's interim position ended.

Plaintiff testified that the Board of Commissioners had to eliminate some SHA staff positions in October, 1982. For example, when the Social Services Director, the Maintenance Supervisor, and the Resident Manager retired or terminated employment, their positions were eliminated and their duties assumed by other staff members. Obviously, when plaintiff returned to her former position as Director of Management, her salary as Interim Executive Director could not have been maintained.

In March, 1983, plaintiff filed a charge of sex discrimination with the Florida Commission on Human Relations and with the Equal Employment Opportunity Commission. On October 31, 1985, the Florida Commission on Human Relations, Division of Administrative Hearings, conducted a hearing regarding plaintiff's allegations of sex discrimination for her failure to be promoted to Executive Director by SHA in violation of Florida Statutes, section 760.-10(1). The January 20, 1986 recommended order by the hearing officer found that plaintiff failed to sustain her burden of proof that SHA discriminated against her. On September, 9 1986, the Florida Commission on Human Relations adopted the hearing officer's findings of fact and conclusions of law and dismissed plaintiff's petition for relief from unlawful discrimination on the basis of sex by SHA.

Plaintiff testified that she received her right to sue approximately on November 15, 1986. Plaintiff, who continues as the Director of Management for defendant SHA, has pursued her contention that she was not promoted to Executive Director because of her sex in this action.

## CONCLUSIONS OF LAW

The court has jurisdiction of this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and 28 U.S.C. § 1331. Plaintiff has alleged that defendant SHA discriminated against her because of her sex by failing to promote her to Executive Director. Title VII

disparate treatment actions are analyzed differently when the evidence of discrimination is circumstantial as opposed to direct.

Where a discriminatory motive is inferred from circumstantial evidence, plaintiff/employee must prove a prima facie case of unlawful discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *see Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Once the plaintiff has established a prima facie case, the burden shifts to the defendant/employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If the defendant articulates such a reason, then plaintiff has the opportunity to prove by a preponderance of the evidence that the defendant's legitimate reason was merely a pretext for its discriminatory action. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *see Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

■ In a case where discrimination is established by direct evidence, however, the Eleventh Circuit has held that a defendant may not rely upon a *McDonnell Douglas* rebuttal. *Thompkins v. Morris Brown College*, 752 F.2d 558, 563 (11th Cir.1985); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875–76 (11th Cir.1985); *Lewis v. Smith*, 731 F.2d 1535, 1538–39 (11th Cir. 1984); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556–57 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir.1982). "If the evidence consists of direct testimony that the defendant acted with a discriminatory motive, *and the trier of fact accepts this testimony*, the ultimate issue of discrimination is proved." *Birmingham Linen Service*, 715 F.2d at 1557 (emphasis added); *see Smith v. Horner*, 839 F.2d 1530, 1536 (11th Cir.1988). Once plaintiff produces credible, direct evi-

dence, "the burden shifts to the defendant to prove by a preponderance of the evidence that the same employment decision would have been reached even absent the discriminatory intent." *Smith*, 839 F.2d at 1536; *see Birmingham Linen Service,* 715 F.2d at 1557; *Lee*, 684 F.2d at 774. In a case based on direct evidence, defendant's burden is one of persuasion and not merely production. *Birmingham Linen Service,* 715 F.2d at 1558.

Plaintiff has attempted to show three instances of direct-evidence discrimination. The first was Pringle's remark, while reviewing resumes of the candidates for Executive Director, that it would have been helpful to have pictures of the applicants so that the Commissioners would know whether they were male or female. Pringle's testimony clarified that the reason for her comment was because she could not distinguish from some of the candidate's names whether they were male or female for the purpose of address. Clearly, the innocuous comment was not discriminatory. There was no questioning of Pringle regarding plaintiff's hearsay testimony that Pringle told plaintiff that the job that plaintiff was doing was man's work. Given Pringle's testimony concerning her only interest in the sex of the applicants, the court cannot accept plaintiff's hearsay testimony as credible.

Furthermore, Pringle explained her specific reason for not voting for plaintiff. She believed that the SHA nepotism policy encompassed her distant relationship with plaintiff. Pringle testified that she told two of the male candidates that she could not support them for the same reason.

Second was the unsworn statement by Whitney that she heard Commissioner Cummings say that he preferred a man to a woman for the Executive Director position. Third was Wakly's admittedly unclear memory that she heard Cummings say at an informal review of the candidate's applications "something to the effect" that he would rather see a baseball coach or a band leader than a woman as Executive Director. Cummings did not testify at trial.

Cummings, however, did testify at the administrative hearing, which was part of the investigation of plaintiff's same allegation of sex discrimination by the Florida Commission on Human Relations. That hearing transcript was admitted into evidence for the purpose of showing the basis of the findings of fact adopted by the Florida Human Relations Commission. Fed.R. Evid. 803(8)(C); *Fowler v. Blue Bell, Inc.,* 737 F.2d 1007, 1013–14 (11th Cir.1984). At the administrative hearing, Cummings testified unequivocally that his candidate choice for the Executive Director position was based on work experience and not sex discrimination. He stated that he did not vote for plaintiff because of her connection with Wilson and the problems of that administration.

The court cannot base direct-evidence analysis on hearsay testimony by plaintiff, Whitney and Wakly. The unsworn statement of Whitney and the speculative, admittedly faulty testimony of Wakly do not overcome Cumming's hearing testimony plainly denying allegations of sex discrimination at the administrative hearing. The court concludes that plaintiff's examples of direct evidence are not credible, and, therefore, unacceptable. *See Wheeler v. Holland,* 218 F.2d 482, 483 (5th Cir.1955) (per curiam). Accordingly, it will analyze this case by the *McDonnell Douglas,* circumstantial evidence standards. *See Smith,* 839 F.2d at 1536–37.

■ In order to establish a prima facie case of promotion discrimination under *McDonnell Douglas,* plaintiff must show three elements:

A plaintiff may establish a prima facie case of promotion discrimination by proving that he or she is a member of a protected minority, was qualified for and applied for the promotion, was rejected despite these qualifications, and that other employees with equal or lesser qualifications who were not members of the protected minority were promoted. (citations omitted).

*Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 n. 7 (11th Cir.1983); *Smith,* 839 F.2d at 1536. Plaintiff meets the three

requirements for a prima facie case. The court concludes that plaintiff has established a prima facie case of promotion discrimination.

Defendant, however, has articulated a legitimate, nondiscriminatory reason for the Commissioners' not appointing plaintiff as Executive Director. Some Commissioners perceived plaintiff as having been too closely connected with the problematic Wilson administration, the association with which SHA was trying to avoid in order to regain respectability. The consistency of the different ballots showed that three of the Commissioners, the necessary majority, would not have voted for plaintiff as Executive Director. The same three Commissioners supported other candidates because of those applicants' particular work experience.

Commissioner Pringle believed that she could not vote for plaintiff because of the SHA nepotism policy. While Pringle's understanding may have been incorrect, she thought that she was complying the SHA nepotism policy, established for a business reason. Her reasoning may have been misguided, but it was not based upon sex discrimination because she testified that she told two male candidates that she could not support them based upon the same logic.

Finally, plaintiff has failed to prove that defendant's articulated, nondiscriminatory reasons for not appointing her Executive Director were a pretext for sex discrimination. Plaintiff's case did not address the concern of some Commissioners that she had been connected with the problems of the Wilson administration. Her evaluations, particularly by Wilson, who supervised her longest, were not outstanding.

Plaintiff also did not prove that her background made her more qualified for the Executive Director position than the other candidates. While Smith's background was different from plaintiff's, she did not show that his qualifications were inferior or that his performance as Executive Director has been deficient, which might have indicated pretext. The court concludes that plaintiff has not proved by a preponderance of the evidence that defendant's articulated, nondiscriminatory reasons for not appointing her Executive Director were a pretext.

While the evidence showed that plaintiff performed satisfactorily as Interim Executive Director, her experience did not make her appointment as Executive Director incumbent upon the Commissioners, especially when there were nondiscriminatory reasons for selecting Elliott Smith. Even if plaintiff were better qualified than Smith, "Title VII does not require an employer to hire or promote the most qualified applicant; it only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin." *McCarthney v. Griffin–Spalding County Board of Education,* 791 F.2d 1549, 1552 (11th Cir.1986); *see Gilchrist v. Bolger,* 733 F.2d 1551, 1553 (11th Cir.1984). Having determined that plaintiff has not met her ultimate *McDonnell Douglas* burden of proving that defendant's articulated, nondiscriminatory reasons for not appointing her Executive Director were a pretext, the court concludes that plaintiff's promotion discrimination action, based on sex, is without merit. The Clerk of Court shall enter judgment for the defendant.

It is SO ORDERED.