912 F.2d 832
 54 Fair Empl.Prac.Cas. 1110,
54 Empl. Prac. Dec. P 40,272
Mary H. CARTER, Plaintiff-Appellant,
v.
SOUTH CENTRAL BELL, Defendant-Appellee.
Tahnella JACKSON, Plaintiff-Appellant,
v.
SOUTH CENTRAL BELL TELEPHONE CO., Defendant-Appellee.
Lemore ALLEN, Plaintiff-Appellant,
v.
SOUTH CENTRAL BELL, Defendant-Appellee.
 No. 88-3777.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 27, 1990.
 
 J. Courtney Wilson, Metairie, La., for plaintiffs-appellants.
 George W. Byrne, Jr., New Orleans, La., for defendant-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before THORNBERRY, JOHNSON, and SMITH, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 Mary H. Carter, Tahnella Jackson, and Lemore Allen appeal a judgment of a United States Magistrate dismissing their claims of racial discrimination by their former employer, South Central Bell Telephone Company (SCB). Because they have not stated a claim under section 1981 of title forty-two, we AFFIRM the dismissal.
 
 
 2
 The appellants also have asked us to consider their claims under Title VII of the Civil Rights Act of 1964. See 42 U.S.C.A. Secs. 2000e to 2000e-17 (West 1981 & Supp.1990). Carter and Jackson never pled Title VII at trial, and we refuse to consider that theory on appeal. Although Allen did plead Title VII as a basis of recovery, we AFFIRM the magistrate's dismissal of two of his complaints under Title VII. But we REVERSE that portion of the magistrate's decision which rejected Allen's claim of retaliatory termination and REMAND it with instructions to reconsider Allen's claim in the light of this opinion.
 
 FACTS AND PROCEDURAL HISTORY
 
 3
 Because the background for Carter and Jackson's claims is different from that of Allen's claims, the history behind Allen's complaint will be discussed separately.
 
 I. CARTER AND JACKSON
 
 4
 Carter and Jackson, black females, were employed in the engineering group of SCB's Westbank Division in New Orleans, Louisiana. Their supervisor was Lester Hopper, a white male.
 
 
 5
 On April 6, 1984, employees of the Westbank Division learned that SCB wanted to reduce its Louisiana work force by 250 employees, twenty-five of whom would be from the New Orleans area. To mitigate the effect of this reduction on SCB's managers, the Personnel Office in Birmingham, Alabama, created a Management Transition and Assistance Plan (MTAP). Under MTAP, SCB could reduce its work force in one of three ways:
 
 
 6
 1. Separation in Lieu of Relocation (SILOR). If an employee was designated as available for relocation, the employee would have the option of either relocating or terminating her employment with SCB. If, at that point, the employee decided to terminate employment, she would receive a lump sum payment.
 
 
 7
 2. Voluntary Accelerated Management Attrition Program (VAMAP). The purpose of VAMAP was to encourage employees to quit their jobs voluntarily. Employees were given a limited period of time during which they could sign a form requesting VAMAP eligibility. From this pool of volunteers, employees would be terminated until the group had been reduced to the desired number of employees. The most senior employees, those with the most service, would be chosen first. Employees who were selected for VAMAP would be given a lump sum payment that was thirty-three percent more than the amount that they would receive if they did not select VAMAP and were terminated under SILOR.
 
 
 8
 3. Involuntary Management Attrition Program (IMAP). If neither SILOR nor VAMAP had sufficiently reduced the number of employees, employees would be fired and given the same amount that they would have received under VAMAP.
 
 
 9
 On April 11, 1984, Peter Massett, a white male supervisor at the Westbank Division, explained MTAP to the Westbank employees. Apparently, Massett told them that the third option under MTAP was "layoff without pay" rather than IMAP. According to SCB's brochure, IMAP was implemented on April 10, 1984; "layoff without pay" was never a possibility.
 
 
 10
 Although Jackson attended the April 11 meeting, Carter and another female engineer, Barbara Johansen, did not. Johansen is white. On April 16, Massett met with Carter and Johansen and gave them the same information he had given to the others.
 
 
 11
 Carter and Jackson volunteered for VAMAP and were selected. The essence of their claim is that they were manipulated into volunteering because of their race.
 
 
 12
 Carter and Jackson testified that Massett had met with them individually and encouraged them to volunteer for VAMAP. They contend that he told them that only fourteen employees would be selected for VAMAP and that if they chose VAMAP and were not selected, they would be protected from SILOR and from being laid off. Massett denied that he had any idea of how many employees would be selected for VAMAP. He also denied encouraging Carter and Jackson to select VAMAP.
 
 
 13
 Carter and Jackson made phone calls to other offices to determine how many employees were going to volunteer for VAMAP. They allege that they told Massett of the employees with whom they had spoken and that Massett told them of other senior employees who were going to take the plan. Convinced that at least fourteen managers were going to select VAMAP, all of whom were senior to them, Carter and Jackson chose VAMAP. After they had made their selection, Massett told them that "layoff without pay" was not one of the programs under MTAP. He told them about IMAP and gave them the opportunity to rescind their VAMAP selection. They decided to stick with VAMAP.
 
 
 14
 As it happened, only thirteen employees in the Westbank Division signed up for VAMAP. All thirteen were chosen. Ten are white, and three, including Carter and Jackson, are black.
 
 
 15
 Johansen did not choose VAMAP. All three appellants testified that Johansen was very worried about losing her job after she was told about SCB's need to cut its work force, but that after she had a private meeting with Massett, she was no longer worried. Carter and Jackson allege that they were encouraged to join VAMAP because they are black and that Johansen's job was protected because she is white.
 
 
 16
 Carter and Jackson brought a claim against SCB under section 1981 alleging racial harassment and constructive discharge. See 42 U.S.C.A. Sec. 1981 (West 1981). Both consented to a non-jury trial before a U.S. Magistrate, who held that they had failed to prove that SCB's conduct was racially motivated. They are appealing that decision. See 28 U.S.C.A. Sec. 636(c) (West Supp.1990).
 
 II. ALLEN
 
 17
 Allen was hired in 1972 and was the first black engineer in the Westbank Division. He contends that SCB discriminated against him in three ways: by failing to transfer him to the "Planning Group," by lowering his performance rating, and by firing him after he filed charges against SCB with the Equal Employment Opportunity Commission (EEOC).
 
 A. Transfer to Planning
 
 18
 The Planning Department was supervised by Aaron Begnaud, a white male. The Planners were responsible for bringing the main telephone cable into an area, whereas engineers at Allen's level were charged with the more mundane task of connecting local homes and businesses to the main cable. For an engineer at SCB, a transfer to Planning was not a promotion, and although it may have been a necessary prerequisite for promotion, it was not sufficient. At trial, Begnaud gave examples of many Planners who had never been promoted.
 
 
 19
 In September 1984, a position became available in the Planning Group when James Burse, a black employee, was terminated. Allen had expressed an interest in the Planning job, but it was given to Johansen, although she had less experience than Allen. Johansen was hired as an engineer at Westbank in 1979.
 
 B. Allen's Performance Rating
 
 20
 Lester Hopper kept a list of all of the Engineers in the Westbank Division in the order of their contribution to SCB. An engineer could be rated a "major contributor" (MC), a "satisfactory contributor" (SC), or an "unsatisfactory contributor" (UC). Only the top fifty percent of the engineers could be given an MC rating. The rankings were determined at a Rank Order Meeting chaired by Hopper, but based on the evaluations by the engineers' individual supervisors. Phil Chavers, a white male, was Allen's supervisor, and his rating of Allen determined where on Hopper's list Allen would be ranked.
 
 
 21
 In January 1985 and January 1986, Allen was given an evaluation of his job performance that rated him SC. During that same period, Johansen was rated MC. (Johansen's supervisor was Massett.) In January 1984, Allen had been rated MC. Allen contends that he was given an SC rating in 1986 because of his race.
 
 
 22
 Massett and Chavers used both objective and subjective factors to evaluate engineers. Objective factors included the size and complexity of the tasks that the engineers performed. Among Chavers' subjective reasons for his evaluation of Allen were that Allen did not get along with other SCB employees and with customers, that he did not make a full effort on routine engineering jobs, and that some of his work had been deficient.
 
 C. Retaliation
 
 23
 Allen filed charges with the EEOC claiming that his evaluation and the failure to transfer him to Planning were motivated by racism. After receiving his right to sue, he filed this lawsuit. Several months later he was fired. Allen alleges that he was fired because he filed charges with the EEOC and then proceeded to sue SCB.
 
 
 24
 In October 21, 1986, Hopper told Allen that he was terminated. The reasons for his discharge have vacillated. Under "reasons for termination," his pink slip says "other," and at the time of his termination, Hopper refused to give him a written explanation of what "other" meant. SCB later claimed that Allen was terminated because he had given proprietary documents to his attorney and because he had falsified an automobile accident report. At trial, SCB dropped the automobile incident as one of the reasons for his dismissal. Now, in their briefs before this Court, both parties again have discussed the accident. Allen also raises several incidents which, he maintains, illustrate the unfair treatment that he allegedly received after he filed his charges with the EEOC.
 
 1. Proprietary Documents
 
 25
 In August 1986, Allen's counsel used an estimate front sheet in his deposition of Johansen. Estimate front sheets contain information regarding job estimates performed by SCB employees. Several days later, he used a job log book in a deposition of Chavers. Hopper attended both depositions, and after the second, he wrote a letter to his manager, Glen Andrews, advising him that Allen may have appropriated proprietary information from the company. Andrews asked the security department to conduct an investigation.
 
 
 26
 The investigation was conducted by John Banquer. Banquer questioned Allen about the estimate front sheet and the log book. Allen refused to answer Banquer's questions without the presence of his attorney. Banquer prepared his report for Andrews. Andrews reviewed the report and concluded that Allen should be discharged. The rationale behind his decision was that Allen had turned the documents over to his counsel and that he had refused to cooperate in the investigation.
 
 
 27
 The magistrate found that Allen turned the estimate front sheet and the log book over to his attorney for use in this proceeding, and Allen offered no other explanation for how his attorney obtained them except to say that he thought that his attorney had subpoenaed them. Allen also admits that SCB considered this information to be "proprietary." His only defense is that the documents were not marked "proprietary" even though SCB policy is to state that all "proprietary" documents should be so marked. However, employee instructions, which Allen received at the time of his employment, stated that employees are not to divulge the contents of any SCB document to anyone not associated with SCB.
 
 
 28
 Even if the documents were proprietary, Allen argues that termination was an exceptionally harsh measure. On October 16, 1986, SCB attorney Charles Rivet sent a memo to Andrews advising him to "go on the offensive" regarding the alleged appropriation of the documents. Allen also introduced evidence that fourteen SCB employees had used the private phone number of a radio station, which SCB admits was "proprietary," to win prizes from the station. By calling the private number instead of the public one, they could avoid a busy signal when prizes were offered. All fourteen employees cooperated in the investigation. Twelve, who are white, admitted that they had used the number and were suspended. The two others, who are black, denied any involvement and were not disciplined.
 
 2. False Accident Report
 
 29
 In September 1986, Allen drove over a curb in a company vehicle, and the vehicle was damaged. Allen testified that he told his manager what had happened and that the manager told him to treat it as a flat tire. SCB did not contradict this. Allen filed an accident report stating that he had a flat tire. Because of the amount of damage to the vehicle, SCB conducted an investigation, which determined that the Allen had been responsible for the accident. The filing of the false accident report initially was one of the grounds for Allen's termination.
 
 3. Other Incidents
 
 30
 Allen also points to a number of incidents that support his retaliation claim. For example, when Allen wrote a letter complaining to Chavers about his ratings, Allen testified that Chavers refused to discuss the letter and remarked, "Everybody knows you filed the lawsuit."
 
 
 31
 Soon after that, Allen was assigned a rush estimate project, but he was scheduled to go on vacation and advised Chavers that he would not be able to complete the estimate before leaving. Chavers allowed Allen to transfer the estimate to another engineer for completion. The job was done poorly, and the estimate front sheet was issued under Allen's name. Chavers knew that Allen had not performed this job, but he still used it in his quality review of Allen.
 
 D. Procedural History
 
 32
 In his initial complaint, Allen asserted that SCB's actions violated both Title VII, see 42 U.S.C.A. Sec. 2000e-5 (West 1981), and section 1981. Allen's action was consolidated with that of Carter and Jackson. After he was terminated, Allen amended his complaint by adding the charge that SCB had fired him vindictively. The magistrate found no support for Allen's charges of discrimination and dismissed his claims.
 
 DISCUSSION
 I. RETROACTIVE APPLICATION OF PATTERSON
 
 33
 After this case was tried, the Supreme Court decided Patterson v. McLean Credit Union, --- U.S. ----, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which restricted the use of section 1981 in employment discrimination suits. As a general rule, this Court must apply any relevant interpretation of section 1981 by the Supreme Court retroactively. See Goodman v. Lukens Steel Co., 482 U.S. 656, 662, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987); Solem v. Stumes, 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984). But in some civil cases, a judicial decision should not be applied retroactively if certain criteria countenance prospective application. Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989). Three guidelines are used to make this determination: whether the decision establishes a new principle of law; whether the purpose of the rule will be supported if the rule is applied retroactively; and whether retroactive application will produce substantial injustice or hardship. See Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 355-56, 30 L.Ed.2d 296 (1971).
 
 
 34
 This Circuit has already concluded that Patterson does establish a new principle of law, which would militate against retroactivity, but that the purpose of Patterson is best served by retroactive operation. See Lavender v. V & B Transmissions & Auto Repair, 897 F.2d 805, 806-07 (5th Cir.1990). If the purpose of the rule is served by applying it retroactively, this should be given greater weight than the extent to which the parties relied on the law that existed before that rule was announced. In re S/S Helena, 529 F.2d 744, 748 (5th Cir.1976). But we still must consider whether the retroactive application of Patterson would cause substantial injustice to these appellants.
 
 
 35
 As explained below, if we were to apply Patterson to this case, the appellants would no longer have a cause of action under section 1981. But the Supreme Court itself applied its decision retroactively to Brenda Patterson, denying her section 1981 claim. Patterson, like Carter and Jackson, chose, for unknown reasons, to pursue a remedy only under section 1981 and not under Title VII. See Patterson, 109 S.Ct. at 2375. Because the Supreme Court applied its holding retroactively to a similarly situated individual, rather than announcing a rule of prospective application, the appellants would have a difficult time proving that retroactive application of the same decision would be unfair. See Williams v. Phil Rich Fan Mfg. Co., 552 F.2d 596, 600 n. 9 (5th Cir.1977). We conclude that they have not met that burden. Therefore, we will apply Patterson 's interpretation of section 1981 to this case.
 
 II. EFFECT OF PATTERSON
 A. Racial Harassment
 
 36
 Section 1981 provides, in part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C.A. Sec. 1981 (West 1981). With respect to the relationship between the employer and employee, section 1981 protects the employee's right to make contracts and to enforce contracts. Patterson, 109 S.Ct. at 2372.
 
 
 37
 The right to make contracts prohibits the employer from refusing to hire someone because of their race or from offering to hire someone only on discriminatory terms. Id. It does not protect the employee from any conduct by the employer after the contractual relationship has begun. Id. at 2373.
 
 
 38
 The right to enforce contracts is the "right of access to legal process, that will address and resolve contract-law claims." Id. The employer may not do anything to hinder the employee's effort to enforce the employment contract through the legal process. Id.
 
 
 39
 Patterson 's interpretation of section 1981 explicitly bars any of the appellants' claims based solely on racial harassment. See id. For example, Allen's SC rating did not impair his right to make or enforce his employment contract. But the holding in Patterson was limited to racial harassment. If Carter and Jackson were manipulated into volunteering for VAMAP, SCB's actions resulted in their discharge. This could be labeled "constructive discharge" rather than simply "harassment." Moreover, two of Allen's claims, that SCB denied him a promotion and fired him in retaliation for taking legal action against them, also are not explicitly covered by Patterson.
 
 
 40
 B. Constructive Discharge: Carter and Jackson
 
 
 41
 The Supreme Court did not decide whether section 1981 prevents an employer from firing an individual because of her race. See Lytle v. Household Mfg., Inc., --- U.S. ----, 110 S.Ct. 1331, 1336 n. 3, 108 L.Ed.2d 504 (1990); Jett v. Dallas Indep. School Dist., --- U.S. ----, 109 S.Ct. 2702, 2709-10, 105 L.Ed.2d 598 (1989). After Patterson, we have held that it does not. See Walker v. South Cent. Bell Tel., 904 F.2d 275, 276-77 (5th Cir.1990); Lavender, 897 F.2d at 807-08; Carroll v. General Accident Ins. Co. of America, 891 F.2d 1174, 1177 (5th Cir.1990). Most Circuits have agreed with us. See Gonzalez v. Home Ins. Co., 909 F.2d 716 (2d Cir.1990); McKnight v. General Motors Corp., 908 F.2d 104, 109 (7th Cir.1990); Courtney v. Canyon Television & Appliance Rental, Inc., 899 F.2d 845, 849 (9th Cir.1990). But see Hicks v. Brown Group, Inc., 902 F.2d 630, 638-40 (8th Cir.1990).
 
 
 42
 Two arguments support the conclusion that section 1981 no longer applies to discriminatory discharge. First, discriminatory termination impairs the employee's right to perform the employment contract, not her right to enter into the contract nor to enforce it.
 
 
 43
 Second, if "conduct is covered by both section 1981 and Title VII, the detailed procedures of Title VII are rendered a dead letter," and, therefore, a court "should be reluctant" to construe section 1981 broadly if that construction will allow a plaintiff to circumvent Title VII. See Patterson, 109 S.Ct. at 2375. Title VII remains a valid remedy if an employee is terminated for discriminatory reasons. See Meyer v. Brown & Root Constr. Co., 661 F.2d 369, 371 (5th Cir.1981); Pittman v. Hattiesburg Mun. Separate School Dist., 644 F.2d 1071, 1074 (5th Cir. Unit A May 1981).
 
 
 44
 We will not stretch the protections of section 1981 to conduct that Title VII already proscribes. Therefore, even if Massett did deliberately misinform Carter and Jackson about VAMAP because they are black, they would not have a cause of action against SCB under section 1981.
 
 C. Failure to Promote Allen
 
 45
 Allen argues that SCB's refusal to transfer him to planning amounted to a failure to promote him. "Whether a promotion claim is actionable under Sec. 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." Patterson, 109 S.Ct. at 2377. The promotion must "rise[ ] to the level of an opportunity for a new and distinct relation between the employee and the employer." Id. Cf. Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609-10, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 (1987) (applying section 1981 to professor's charge that he was denied tenure because of his race).
 
 
 46
 In this case, we need not dissect the Court's "new and distinct" relation criterion to test its perimeters. Cf. Malhotra v. Cotter & Co., 885 F.2d 1305, 1311 (7th Cir.1989) (proposing two interpretations of the "new and distinct relation" test). A transfer to the Planning Group was not a promotion; it was, at most, a necessary precondition to promotion, or as Allen himself calls it, "an opportunity to progress." Appellant's Opening Brief at 20. Many employees in the Planning Group were never promoted.
 
 
 47
 At the Westbank Division, a transfer to Planning was a change that was part of the ordinary progression of an SCB engineer. See McKnight, 908 F.2d at 110. As such, it is not within the ambit of protection given by section 1981.
 
 D. Retaliatory Termination Against Allen
 
 48
 Allen claims that he was terminated because he filed a charge with the EEOC and that the reasons SCB gave for firing him--taking proprietary documents and, initially, falsifying an accident report--were pretextual.
 
 
 49
 In this Circuit before Patterson, section 1981 protected employees from retaliatory termination. See Goff v. Continental Oil Co., 678 F.2d 593, 598 (5th Cir.1982). Because Goff is the law of the Fifth Circuit, we must follow its interpretation of section 1981 unless that interpretation is irreconcilable with Patterson. See United States v. Don B. Hart Equity Pure Trust, 818 F.2d 1246, 1250 (5th Cir.1987); National Labor Relations Bd. v. Datapoint Corp., 642 F.2d 123, 129 (5th Cir. Unit A April 1981). We have questioned, but never decided, whether Goff survived Patterson.[1] See Rathjen v. Litchfield, 878 F.2d 836, 842 (5th Cir.1989). We now hold that it does not. See, e.g., Brown v. United States, 890 F.2d 1329, 1336 & 1339 (5th Cir.1989) (overruling a prior Fifth Circuit opinion because a subsequent Supreme Court case was implicitly inconsistent with it).
 
 
 50
 Three arguments support our holding that section 1981 no longer extends to retaliatory termination. First, Title VII will protect an employee from retaliation. See 42 U.S.C.A. Sec. 2000e-3(a) (West 1981); Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1576 (5th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990). As noted above, we should not interpret section 1981 to duplicate that protection unless the overlap of the two statutes is "necessary." See Patterson, 109 S.Ct. at 2375. While an employer who retaliates against an employee may discourage that employee (or others) from using the legal process, the employer has not impaired or impeded the employee's ability to enforce his employment contract. While these concepts have been construed to be synonymous, see Hicks, 902 F.2d at 638 n. 20; Malhorta, 885 F.2d at 1314 (Cudahy, J., concurring), we do not believe that it is "necessary" to do so, see Overby v. Chevron USA, Inc., 884 F.2d 470, 473 (9th Cir.1989).
 
 
 51
 Second, when Allen filed his charge with the EEOC, he was asserting a right given to him by the Civil Rights statutes, not by his employment contract with SCB. See McKnight, 908 F.2d at 112; Sherman v. Burke Contracting, Inc., 891 F.2d 1527, 1535 (11th Cir.1990). Therefore, Allen's right to enforce his employment contract was not impaired. Compare Goodman, 482 U.S. at 659-60, 107 S.Ct. at 2620 (challenging union's failure to assert instances of racial discrimination against employees, in violation of contractual collective bargaining agreement, under section 1981).
 
 
 52
 Finally, we have already held that discriminatory discharge is no longer actionable under section 1981. Were we to hold that section 1981 still encompasses retaliatory discharge, we would be encouraging litigation to determine what the employer's subjective motive was when he fired the employee: was it to retaliate or "merely" to discriminate? This would be pointless. Both motives are equally invidious, and the employee suffers the same harm. Because section 1981 no longer covers retaliatory termination, all suits for discriminatory dismissal must be brought under Title VII.
 
 III. TITLE VII REMEDY
 
 53
 Because we have decided to apply Patterson retroactively to bar their section 1981 claims, the appellants ask us to remand this case to the district court with instructions to consider their complaints under Title VII, 42 U.S.C.A. Secs. 2000e to 2000e-17 (West 1981 & Supp.1990). For the reasons given below, we decline to substitute a Title VII remedy for Carter and Jackson, but we will reach the merits of Allen's Title VII claims.
 
 A. Carter and Jackson
 
 54
 Carter and Jackson never pled Title VII. Nevertheless, they claim that we have a duty to substitute Title VII for section 1981, their failed cause of action. They cite two cases for this proposition: Hildebrand v. Honeywell, Inc., 622 F.2d 179, 181 (5th Cir.1980) and Rohler v. TRW, Inc., 576 F.2d 1260, 1264 (7th Cir.1978). But the appellants' argument and the cited authority are relevant only if the appellants' complaint had a jurisdictional defect. See 5 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1209, at 112-14 (1990). We are not dismissing the appellants' section 1981 claims for lack of subject matter jurisdiction. See McGinis v. Ingram Equip. Co., 888 F.2d 109, 112 (Cox, J., dissenting), opinion vacated by 895 F.2d 1303 (11th Cir.1989). We are dismissing their complaints because section 1981 no longer affords them a basis on which we can grant relief. See Bell v. Hood, 327 U.S. 678, 681-82, 66 S.Ct. 773, 775-76, 90 L.Ed. 939 (1946) (holding that federal jurisdiction exists if the complaint states a "colorable" case arising under federal law, even though on the merits the party may have no federal right); Holland/Blue Streak v. Barthelemy, 849 F.2d 987, 988-89 (5th Cir.1988) (explaining the difference between a challenge based on jurisdictional grounds and a challenge based on a failure to state a claim upon which relief can be granted). We have no duty to substitute Carter and Jackson's abrogated theory with a valid one. See Baldwin County Welcome Center v. Brown, 466 U.S. 147, 150, 104 S.Ct. 1723, 1725, 80 L.Ed.2d 196 (1984) (noting that Title VII actions should not be given a special status under the Federal Rules of Civil Procedure).
 
 B. Allen
 
 55
 In his initial complaint, in which he alleged that SCB had discriminated against him by rating him SC rather than MC and by not transferring him to Planning, Allen asserted Title VII as one theory of recovery. He had filed his charges with the EEOC and received a right to sue for both allegations, and we will review the magistrate's dismissal of those claims.
 
 
 56
 In his amended complaint, Allen added an allegation of retaliatory termination against SCB. He never filed this charge with the EEOC, and he never received a right to sue. Normally, a Notice of a Right to Sue is a jurisdictional prerequisite to a Title VII action. See Ray v. Freeman, 626 F.2d 439, 442 (5th Cir.1980), cert. denied, 450 U.S. 997, 101 S.Ct. 1701, 68 L.Ed.2d 198 (1981). But because Allen's other Title VII claims were properly before the magistrate, we believe that this Court has jurisdiction over Allen's retaliatory termination claim as well. See Gottlieb v. Tulane Univ., 809 F.2d 278, 284 (5th Cir.1987).
 
 1. Standard of Review
 
 57
 A magistrate trying a case with the consent of the parties is entitled to the same deference that is given to findings of a district judge. See Lockette v. Greyhound Lines, Inc., 817 F.2d 1182, 1185 (5th Cir.1987). Therefore, we will not set aside the magistrate's ruling unless we find that it was clearly erroneous, giving "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a).
 
 
 58
 2. Performance Rating and Transfer to Planning
 
 
 59
 As noted above, SCB supervisors used both objective and subjective criteria in their performance evaluations. Although the parties dispute the relative significance of each of the objective criterion, the magistrate found that both Allen and Johansen had the same objective ratings. Nevertheless, in the 1986 evaluation, Allen was ranked twenty-fourth and Johansen was ranked seventh. It follows that this discrepancy, and Allen's resulting SC rating,[2] occurred from the use of subjective factors in evaluating the candidates.
 
 
 60
 SCB's use of subjective criteria to evaluate its engineers was not discriminatory per se. See Page v. U.S. Indus., Inc., 726 F.2d 1038, 1046 (5th Cir.1984). But we will review SCB's subjective hiring practices under both the disparate treatment and disparate impact theories. See Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 989-90, 108 S.Ct. 2777, 2786, 101 L.Ed.2d 827 (1988).
 
 
 61
 The disparate treatment model requires a finding of intentional discrimination. Trevino v. Holly Sugar Corp., 811 F.2d 896, 902 (5th Cir.1987). Allen must prove more than "isolated" or "sporadic" acts of discrimination; he must prove "that racial discrimination was the company's standard operating procedure--the regular rather than the unusual practice." Id. (citing International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). A disparate impact claim does not require Allen to prove SCB's discriminatory motive, but does require him to show that facially neutral employment practices fall more harshly on one group than another and cannot be justified by business necessity. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).
 
 
 62
 The magistrate held that Allen failed to show widespread discrimination in the use of the evaluating criteria, and we agree. A white engineer, Norman Gautreaux, was rated SC based on the same subjective factors used to evaluate Allen, and Gautreaux's quality rating in 1986 was significantly higher than Allen's. Furthermore, Phil Chavers, Allen's supervisor, also evaluated Hershel Nisby, another black employee at SCB. Nisby received an MC rating.
 
 
 63
 Applying the same tests, we find no evidence that Allen was not transferred to Planning because he is black. Begnaud testified that he had considered specific criteria in selecting the new Planner, including computer knowledge, ability to coordinate projects with other engineers, engineering expertise, and ability to sell projects to the staff. Begnaud stated that he had used these same criteria to select two former Planners who are black: James Burse and Earl Jeffers. Allen argues that in several of these areas his skills were superior to those of Johansen, but he did not demonstrate a conspicuous edge in any area except length of service with SCB. Apparently, this had never been one of the criteria for a Planning job.
 
 
 64
 Therefore, we find no error in the magistrate's dismissal of Allen's racial harassment claims.
 
 3. Retaliatory Termination
 
 65
 Title VII prohibits an employer from discriminating against an employee if the employee alleges that the employer has engaged in unlawful employment practices. 42 U.S.C.A. Sec. 2000e-3(a) (West 1981). To prove that SCB has violated this provision, Allen must show that he engaged in an activity protected by Title VII, that an adverse employment action occurred, and that there was a causal connection between the participation in the protected activity and the adverse employment decision. See McDaniel v. Temple Indep. School Dist., 770 F.2d 1340, 1346 (5th Cir.1985).
 
 
 66
 Although the magistrate recited this test, we are uncertain how he applied it. Because of our uncertainty, we are remanding Allen's Title VII claim for fully developed legal conclusions consistent with this opinion.
 
 
 67
 From our reading of the record, it appears that Allen has met the first two criteria. He did engage in a protected activity, and adverse consequences ensued, the most notable of which was the decision by Chavers to use sloppy work done by another employee in Allen's performance review. The only issue that remains is whether Allen's termination and his protected activities were causally connected.
 
 
 68
 The problem in determining causation in this context is that Allen's suit and his termination are inherently interrelated. Allen was charged with having turned the estimate front sheet and log book over to his attorney, and, therefore, Allen's legal action must have played a role in Glen Andrew's decision to fire him.
 
 
 69
 In a mixed motive case such as this one, the usual sequence of proof used for Title VII cases does not resolve the problem. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973). The employer cannot discharge his burden simply by proffering a legitimate reason that the magistrate believes, because both the legitimate reason and the illegal one played a part in the decision. Under these circumstances, the burden shifts to the employer to prove that he would have made the same decision regarding the employee even if he had not taken the illegitimate reason into consideration. See Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989) (plurality). "[I]n multiple causation cases, where a breach of duty has been established, the common law of torts has long shifted the burden of proof to multiple defendants to prove that their negligent actions were not the 'but-for' cause of the plaintiff['s] injury." Id. 109 S.Ct. at 1797 (O'Connor, J., concurring). Furthermore, the Supreme Court has consistently shifted the burden of proof to the defendant in mixed motive cases involving constitutional violations. See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Hunter v. Underwood, 471 U.S. 222, 228, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985).
 
 
 70
 Therefore, we hold that SCB must prove, by a preponderance of the evidence, that it would have fired Allen for taking the documents even if Allen had not been involved in litigation against SCB. By this, we do not mean that the magistrate may not consider how Allen used the documents. For example, SCB does not have to show that they would have fired Allen had he taken these documents home and thrown them away. But they do have to show that dismissal was an appropriate remedy for personal use of proprietary information. This information was used against the company's interests; the magistrate may consider this as well.
 
 IV. CONCLUSION
 
 71
 Applying Patterson, we hold that the appellants' claims of racial harassment and Carter and Jackson's claims of constructive discharge are no longer actionable under section 1981. Because Carter and Jackson pled only section 1981, we AFFIRM the judgment of the magistrate dismissing their claims.
 
 
 72
 Allen invoked the protection of Title VII in addition to section 1981. Applying Title VII, we find no error in the magistrate's dismissal of Allen's charges of racial discrimination, and we AFFIRM that decision. However, we are unable to understand the analysis that the magistrate used in dismissing Allen's claim of retaliatory termination, so we are REVERSING that portion of the case and REMANDING Allen's Title VII retaliatory termination claim to the magistrate with instructions to reconsider it in the light of this opinion.
 
 
 
 [1]
 Two district courts in our Circuit have concluded that Goff was overruled by Patterson. See Kozam v. Emerson Elec. Co., 739 F.Supp. 307, 310 (N.D.Miss.1990); Jackson v. GTE Directories Serv. Corp., 734 F.Supp. 258, 265-66 (N.D.Tex.1990)
 
 
 [2]
 As explained earlier, only fifty percent of the engineers in the Westbank Division could receive an MC rating. Between forty and forty-five engineers worked at Westbank. The MC line was drawn at Lemore Allen, allowing a white engineer, ranked twenty-third, to receive an MC rating