Ronald R. **WEAVER**, Plaintiff–Appellee,

v.

**CASA GALLARDO, INC.**, A Foreign Corporation doing business in the State of Florida, Defendant–Appellant.

No. 89–3245.

United States Court of Appeals, Eleventh Circuit.

Feb. 1, 1991.

Richard H. Sinkfield, Atlanta, Ga., for defendant-appellant.

Kaydell O. Wright Douglas, Tampa, Fla., for plaintiff-appellee.

Before CLARK, EDMONDSON and RUBIN *, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Casa Gallardo, Inc., appeals a finding of liability and the award of damages under Title VII [1] of the Civil Rights Act of 1964 and § 1981 [2] for discriminatory and retaliatory employment actions against Ronald R. Weaver, a black male, formerly employed by Casa Gallardo. For the reasons detailed below, we affirm the judgment of liability under Title VII for both of Weaver's failure-to-promote claims and for his claim of retaliatory and discriminatory discharge, reverse the district court's judgment of liability under § 1981 for Casa Gallardo's failure to promote Weaver on two occasions, and for its termination of Weaver, and remand for the district court's reevaluation of the failure-to-promote claims under § 1981 in the wake of *Patterson v. McLean Credit Union.* [3] We also remand for reevaluation of its award of damages.

### I.

Ronald Weaver joined Casa Gallardo in 1980 as an experienced manager in the restaurant business, transferring from an Area Supervisor position with Red Lobster, a business then owned through Casa Gallardo by General Mills, Inc. Weaver spent three months at Casa Gallardo as a Manager Trainee, then became a restaurant manager, then in July, 1981, was promoted to Area Supervisor.

In November, 1982, Jim Bunting, the Director of Operations for Casa Gallardo and Weaver's immediate supervisor, created the Operations–Manager position. Operations Managers were to rank between Area Supervisors and the Director of Operations in the Casa Gallardo hierarchy. Bunting considered for promotion each of the four Area Supervisors, including Weaver, and selected Ted Geiger, a white male.

By the summer of 1983, Bunting had decided to create a second Operations–Manager position and he again reviewed the performance of each Area Supervisor. Again, he selected a white male, William Matseas, one of Weaver's former trainees. On October 10, Weaver filed a charge of discrimination relating to both promotions with the Equal Employment Opportunity Commission.

On April 4, 1984, David Lane, Casa Gallardo's Vice President of Operations, terminated Weaver's employment. Weaver filed a second charge of discrimination with the EEOC following his dismissal.

Weaver asserted that he was denied both promotions and eventually discharged because of his race and in retaliation for filing a complaint against Casa Gallardo with the EEOC, and that he was entitled to relief under Title VII and § 1981. After a bifurcated bench trial, the district court found Casa Gallardo liable to Weaver for all three employment decisions under both Title VII and § 1981. After hearing evidence relating to damages, the court awarded Weaver $230,972.00 plus prejudgment interest of $41,815.58 for losses of back pay and benefits, $160,305.00 for three years of front pay damages, $5,000 for compensatory damages pursuant to § 1981, and attorney's fees in the amount of $26,730.00, a total of $464,822.58. Casa Gallardo appeals each determination of liability and challenges the damages award on a number of grounds.

### II.

#### A. *Section 1981 Claims*

Weaver challenged each of the employment decisions on both Title VII and § 1981 theories. The district court's judgment in his favor awarded him compensatory damages for the consequences of each

---

* Honorable Alvin B. Rubin, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. 42 U.S.C. § 2000e–2(a), –3(a) (1988).

2. 42 U.S.C. § 1981 (1988).

3. 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

decision without explicitly recognizing that compensatory damages may not be awarded for a violation of Title VII.[4] We must therefore review the correctness of the award for each claim under § 1981.

Subsequent to the rendition of the district court judgment, the Supreme Court held in *Patterson v. McLean Credit Union*[5] that § 1981 as an earlier statute should not be read "broadly where the result is to circumvent the detailed remedial scheme constructed in a later statute," Title VII,[6] and "covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process," excluding "postformation conduct unrelated to an employee's right to enforce her contract, such as incidents relating to the conditions of employment."[7] The petitioner in *Patterson* did not present a discriminatory-discharge claim, nor did the Court directly address such a situation. Moreover, the Court did not resolve the question whether § 1981 applied to Patterson's failure-to-promote claim, since the defendant had never argued at any stage that § 1981 excluded such a claim, but noted:

> [W]hether a promotion claim is actionable under § 1981 depends on whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981. In making this determination, a lower court should give a fair and

natural reading to the statutory phrase "the same right ... to make ... contracts," and should not strain in an undue manner the language of § 1981.[8]

Notwithstanding *Patterson*'s obvious pertinence to dual section 1981/Title VII claims, applying the decision requires two preliminary determinations. The first is whether the mode of analysis suggested by *Patterson* should be applied retroactively to cases that had been tried before it was decided but in which the judgment was not yet final. In *Lytle v. Household Manufacturing*,[9] the Supreme Court indicated its belief that the Fourth Circuit would find it appropriate to apply the intervening decision of *Patterson* upon its reconsideration of the petitioner's § 1981 claims, although the issue had not been properly presented to the Court itself.[10] This court has not explicitly resolved the issue of *Patterson*'s retroactivity, but we have previously applied it as an intervening decision in cases on appeal,[11] and other circuits have concluded extensive retroactivity analyses in favor of its retroactive application.[12] We therefore conclude that *Patterson* governs this case. This application of *Patterson* is not precluded by the fact that Casa Gallardo raised no objection to the application of § 1981 in the trial court. Casa Gallardo did properly raise the *Patterson* issue on appeal,[13] and Weaver has failed to argue that Casa Gallardo waived the issue, thus waiving his right to do so.[14]

1. *Applying § 1981 to Weaver's Promotion Claims.* *Patterson*, in dicta, stat-

---

**4.** *See Walker v. Ford Motor Co.,* 684 F.2d 1355, 1364 (11th Cir.1982).

**5.** 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

**6.** *Id.* at ——, 109 S.Ct. at 2374–75.

**7.** *Id.* at ——, 109 S.Ct. at 2374.

**8.** *Id.* at ——, 109 S.Ct. at 2377.

**9.** —— U.S. ——, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990).

**10.** *Id.* 110 S.Ct. at 1336 n. 3.

**11.** *See Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527, 1534 (11th Cir.1990) (per curiam), *cert. denied,* —— U.S. ——, 111 S.Ct. 353, 112 L.Ed.2d 317 (1990); *see also Increase Minority*

*Participation by Affirmative Change Today, Inc. v. Firestone,* 893 F.2d 1189, 1199–1201 (11th Cir.1990) (Edmondson, J., dissenting), *cert. denied,* —— U.S. ——, 111 S.Ct. 133, 112 L.Ed.2d 100 (1990).

**12.** *See, e.g., Bailey v. Northern Ind. Pub. Serv. Co.,* 910 F.2d 406 (7th Cir.1990); *Gonzalez v. Home Ins. Co.,* 909 F.2d 716 (2d Cir.1990); *McKnight v. General Motors Corp.,* 908 F.2d 104 (7th Cir.1990); *Courtney v. Canyon Television & Appliance Rental,* 899 F.2d 845 (9th Cir.1990); *Lavender v. V & B Transmissions & Auto Repair,* 897 F.2d 805 (5th Cir.1990); *Carroll v. General Accident Ins. Co.,* 891 F.2d 1174 (5th Cir.1990).

**13.** *See McGinnis v. Ingram Equipment Co.,* 918 F.2d 1491, 1494 (11th Cir.1990) (en banc).

**14.** *See id.* at 1497.

ed that "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981," and referred to the refusal of a law firm to promote an associate to partner considered in *Hishon v. King & Spalding*.[15] *Patterson's* discussion of § 1981 makes the focus of the test fairly clear: a plaintiff's failure-to-promote claim is cognizable under § 1981 if the promotion would have entailed a new contractual relationship between the employee and the employer, "involving in effect the opportunity to enter into a new contract with the employer."[16]

The parties had no opportunity to develop the record with an eye toward determining whether the promotion given Geiger would in fact, as to Weaver, have entailed a "new contract" within the meaning of § 1981, and the district court had no opportunity to make an initial finding. We, therefore, remand for consideration of the question whether the failure to promote Weaver to Operations Manager denied him the opportunity to enter into a new contract with Casa Gallardo as contemplated by *Patterson*.[17]

■ 2. *Applying § 1981 to Weaver's Discharge Claims.* This circuit has previously determined that *Patterson's* interpretation of § 1981 precludes claims for retaliatory discharge, and our reasoning necessarily applies to discriminatory-discharge claims as well.[18] This establishes the law of the circuit and Weaver does not present any argument on appeal for distinguishing his circumstances. In addition, the Second, Fifth, Sixth, Seventh, and Ninth Circuits have found that *Patterson* bars § 1981 relief for discriminatory discharge,[19] the Fourth Circuit has so held in an unpublished opinion,[20] and a panel of the Eighth Circuit has criticized that circuit's prior holding that *Patterson* does not bar such relief.[21] Accordingly, Weaver's termination claim is not cognizable under § 1981.

B. *Weaver's Title VII Promotion Claims*

Weaver might have characterized his case as one presenting direct evidence of discrimination, thereby triggering the analysis articulated by *Price Waterhouse v. Hopkins*,[22] but both he and the district court regarded his case as one squarely invoking the presumption approach of *McDonnell Douglas Corporation v. Green*.[23] Although the distinctions, if any, between a direct-evidence case[24] and a circumstantial-evidence case[25] are in doubt,

---

**15.** *Patterson*, 491 U.S. at —, 109 S.Ct. at 2377 (citing *Hishon*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

**16.** *Id.* But see *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1311 (7th Cir.1989).

**17.** See *Malhotra*, 885 F.2d at 1311–12. But see *Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 910 (4th Cir.1989). See also Comment, Section 1981 Promotion Claims After Patterson v. McLean Credit Union, 57 U. of Chi.L. Rev. 903 (1990).

**18.** *Thompkins v. Dekalb County Hosp. Auth.*, 916 F.2d 600 (11th Cir.1990); see *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1534–35 (11th Cir.1990) (per curiam).

**19.** *Prather v. Dayton Power & Light Co.*, 918 F.2d 1255 (6th Cir.1990); *Gonzalez v. Home Ins. Co.*, 909 F.2d 716, 722 (2d Cir.1990); *McKnight v. General Motors Corp.*, 908 F.2d 104, 108–09 (7th Cir.1990); *Courtney v. Canyon Television & Appliance Rental*, 899 F.2d 845, 849 (9th Cir. 1990); *Lavender v. V & B Transmissions & Auto Repair*, 897 F.2d 805, 807–08 (5th Cir.1990).

**20.** *Barringer v. AT & T Technologies, Inc.*, 902 F.2d 27 (4th Cir.1990) (table) (text in Westlaw).

**21.** *Taggart v. Jefferson County Child Support Enforcement Unit*, 915 F.2d 396 (8th Cir.1990) (criticizing *Hicks v. Brown Group, Inc.*, 902 F.2d 630 (8th Cir.1990)).

**22.** 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); see *Caban–Wheeler v. Elsea*, 904 F.2d 1549, 1554–55 (11th Cir.1990); *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1071 & n. 9 (11th Cir.1990); *Jones v. Gerwens*, 874 F.2d 1534, 1539 n. 8 (11th Cir.1989).

**23.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**24.** See *Caban–Wheeler*, 904 F.2d at 1555; *Hill v. Metropolitan Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir.1988), *modified on other grounds*, 848 F.2d 1522 (11th Cir.1988).

**25.** *Compare Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1519 (11th Cir.1990) (per curiam) *with Smith v. Horner*, 839 F.2d 1530, 1536 (11th

Weaver's consistent preference for the *McDonnell Douglas* characterization leads us to examine his case in that fashion.[26]

Under *McDonnell Douglas* and *Texas Department of Community Affairs v. Burdine*,[27] "a plaintiff has the initial burden of establishing a prima facie case of racial discrimination by a preponderance of the evidence." Once established, this raises a presumption that the defendant racially discriminated against the plaintiff. "[T]he burden then shifts to the defendant to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the defendant discriminated against the plaintiff ... articulating a 'legitimate, nondiscriminatory reason' for its actions against the plaintiff, a reason which is 'clear and worthy of credence.' " This is but a burden of production, and the employer need not persuade the court that it was actually motivated by the reason advanced. "Once the defendant satisfies this burden of production, the plaintiff then has the burden of persuading a court that the proffered reason for the employment decision is a pretext for discrimination."[28]

To establish a prima facie case, the plaintiff "must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination."[29] We examine Weaver's pri-

ma facie case and any subsequent burdens in the context of each employment decision, reviewing only for clear error the district court's determination that Gallardo intentionally discriminated against Weaver.[30] We may reverse that determination only if we are left with "a definite and firm conviction that an error has been made."[31]

1. *The Geiger Promotion.* Weaver first asserts that Casa Gallardo practiced racial discrimination in promoting Ted Geiger in preference to him in November, 1982.

■ Citing *Zipes v. Trans World Airlines, Inc.*,[32] Casa Gallardo suggests that the Geiger promotion claim is timebarred under Title VII because the relevant charge was not filed with the EEOC until more than 300 days after the alleged discriminatory act.[33] *Zipes*, however, holds that the time limitation for EEOC charges is *not* a jurisdictional prerequisite for filing a Title VII suit.[34] The decision therefore tends to undercut Casa Gallardo's argument, which is raised for the first time on appeal. *Zipes* treated the filing requirement as "subject to waiver, estoppel, and equitable tolling,"[35] and we have recognized that the failure to comply with this exhaustion requirement may be waived if not raised.[36] By extension, we are required to regard the issue as waived if it is first raised on appeal, as it is here.[37]

Cir.1988) *and Thompkins v. Morris Brown College,* 752 F.2d 558, 563 (11th Cir.1985).

**26.** *Cf. Smith,* 839 F.2d at 1537.

**27.** 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**28.** *Caban–Wheeler,* 904 F.2d at 1554 (citations to *Burdine* omitted).

**29.** *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094; *see McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

**30.** *See Pullman–Standard, Div. of Pullman, Inc. v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

**31.** *Noble v. Alabama Dept. of Environmental Management,* 872 F.2d 361, 365 (11th Cir.1989) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

**32.** 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

**33.** *See* 42 U.S.C. § 2000e–5(e) (180 day limitation).

**34.** 455 U.S. at 392–93, 102 S.Ct. at 1132–1135.

**35.** *Id.* at 393, 102 S.Ct. at 1132.

**36.** *Cf. Larkin v. Pullman–Standard Division, Pullman Inc.,* 854 F.2d 1549, 1563 (11th Cir. 1988), *vacated,* —— U.S. ——, 110 S.Ct. 316, 107 L.Ed.2d 307 (1989); *Bates v. Tennessee Valley Auth.,* 851 F.2d 1366, 1368 (11th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed. 1020 (1989); *Wade v. Secretary of the Army,* 796 F.2d 1369, 1378 (11th Cir.1986).

**37.** *See Hernandez v. Hill Country Tel. Cooperative,* 849 F.2d 139, 142 (5th Cir.1988) (citing *Moore v. Tangipahoa Parish School Bd.,* 594 F.2d 489, 495 (5th Cir.1979), and *Pearce v. Wichita County,* 590 F.2d 128, 134 (5th Cir.1979)).

Weaver's argument that he is entitled to recover even if this claim was not timely filed does not constitute a waiver of his rights as Casa Gallardo contends, a distortion of Weaver's argument. We therefore proceed to the merits of the district court's findings.

Weaver plainly satisfied his burden of offering a prima facie case relative to the Geiger promotion. He established without contradiction that he belonged to a racial minority and that he applied for the position eventually awarded Geiger, a white man. Casa Gallardo concedes that Weaver applied and was considered for the position before Geiger was selected, and does not contend that the deficiencies in Weaver's performance that it stresses in rebuttal rendered him unqualified for purposes of establishing his prima facie case under *McDonnell Douglas.*[38]

Casa Gallardo, in turn, discharged its burden of rebutting the presumption of discrimination by articulating "some legitimate, non-discriminatory reason" for its decision not to promote Weaver.[39] Weaver, like other managers employed by Casa Gallardo, was evaluated by his supervisor at frequent intervals ranging from once every three months during the first year after his promotion to Area Supervisor to twice a year for the remainder of his employment. Evaluations in each of twelve to fourteen areas and in overall rating could vary from "unsatisfactory" to "unusually well done." Geiger's evaluations might well have been considered superior to Weaver's in job performance, entitling him to preference for promotion. In sum, Casa Gallardo's objective and subjective performance reviews, combined with the testimony of its managerial employees, are sufficient to raise a genuine issue of fact as to whether Casa Gallardo discriminated against Weaver in the Geiger promotion.[40]

To prevail, therefore, Weaver must demonstrate by a preponderance of the evidence that he was the victim of intentional racial discrimination, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[41]

■ The evidence that "race was a *significant* factor in the defendant's decision"[42] was not strong, but we cannot say that the district court committed clear error in determining that Casa Gallardo's recited reasons were pretextual. Weaver presented five types of evidence of racial incidents relating to his promotion and termination claims. First, Weaver testified that Tom Greene, Gallardo's Vice President of Operations, routinely called him "black knight" and "midnight cowboy," sometimes in the presence of other employees and fellow executives, including both Geiger and Bunting. Raymond Johnson, a former Casa Gallardo employee, testified that one General Manager informed him that Weaver was no longer with Casa Gallardo because he had been considered a "midnight cowboy," but his informant refused to explain. Weaver also testified that at a cocktail party in December, 1982, in front of Bunting, Greene asked Weaver if he knew what "we call [brazil nuts] back home." Weaver later learned from a friend that brazil nuts were sometimes referred to as "nigger toes."

Second, Weaver testified that at his first meeting with Wayne Jones, President of Casa Gallardo, on July 18, 1983, Jones commented that, because of his rearing, he had to be careful in the presence of articulate black men. Weaver testified that he found the comment shocking and demoralizing.

---

**38.** But cf. *Hill v. Seaboard Coast Line R. Co.,* 885 F.2d 804, 808–10 (11th Cir.1989).

**39.** See *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824).

**40.** See *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

**41.** See *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Caban–Wheeler,* 904 F.2d at 1554.

**42.** *Lincoln v. Board of Regents,* 697 F.2d 928, 938 (emphasis in original), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); *cf. Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1502 (11th Cir.1990).

Third, Weaver testified that he was excluded from social functions because of his race and that these functions were critical to advancement. Weaver's testimony suggests that Geiger and Bunting interacted socially; Geiger once stayed at Greene's home for two weeks; Weaver was not invited to play racquetball with other managers, to certain parties, or to the homes of others; and that his social relations with management were limited to post-meeting dinners.

Fourth, Weaver presented evidence suggesting that Geiger was a racist. Weaver testified that Geiger, after inquiring about an employee's progress and being assured that the employee's performance was acceptable, stated, "Well good, because we have had so much trouble with our Hispanic employees." Weaver also reported that he had heard of another employee calling Geiger a racist upon being terminated. Raymond Johnson testified that his supervisor had told him "jokingly" that Geiger would not promote Johnson because Johnson was black and Geiger was a racist, and that this supervisor routinely hinted that Geiger was racist. Johnson also testified that his observation of his own career and those of other blacks at Casa Gallardo indicated to him that Geiger was racist.

Fifth, Weaver and others suggested that certain incidents demonstrated racism among lower management at Casa Gallardo, citing an incident at a Charlotte restaurant when a manager destroyed a black's application for a position at Casa Gallardo and threw it into the garbage.

Casa Gallardo presented evidence to contradict the occurrence of some of these events and the interpretation placed by Weaver on others. The district court simply did not accept this rebuttal. While Weaver's evidence was hardly overwhelming, the case was tried by an experienced and able trial judge, who had the opportunity to observe the witnesses and appraise the credibility of the claims that Weaver was not as well qualified as Geiger. The record before us is but typed words. The trial judge may well have concluded that the testimony of Casa Gallardo's witnesses, however plausible when read, was designed to protect the employer and to mask the truth. We cannot, therefore, say that we are left with the firm conviction that the district court erred in finding that Weaver had demonstrated that race was a significant factor in Casa Gallardo's denying him the promotion awarded Geiger.

Casa Gallardo contends that the district court applied an incorrect legal standard by finding only that race was a factor, not a "significant" one. The court correctly stated the legal standard and its opinion as a whole reflects application of the significant-factor test. Its failure on every occasion to add the adjective "significant" does not portend legal error.

2. *The Matseas Promotion.* With regard to the Matseas promotion, Weaver's prima facie case, Casa Gallardo's rebuttal, and Weaver's attempt to demonstrate pretext take much the same form as they did with the Geiger promotion. Although Casa Gallardo certainly articulated a legitimate reason for promoting Matseas to rebut Weaver's *McDonnell Douglas* presumption, the evidence of Matseas's superiority is less compelling than the evidence with regard to Geiger, indicating a greater possibility that illegitimate considerations played a significant part in Matseas's promotion.

The second Operations Manager position was created and filled in August, 1983. Subsequent to the decision to promote Geiger, Weaver had received one performance review, rating him overall as "needs improvement/satisfactory". Matseas had only recently become one of Weaver's peers, having been promoted by Weaver to Assistant Manager, Manager, and General Manager. As General Manager, Matseas received two "above average" ratings from Weaver, and was then promoted to Area Supervisor in November, 1982. Matseas assumed what had been Weaver's area of supervision, a development that Weaver regarded as a demotion. Geiger's first and only review of Matseas in that capacity appears to give him a rating of "satisfactory" or "needs improvement/satisfactory."

Moreover, Matseas appears to have been a problematic Area Supervisor during his

short tenure. Two deposition witnesses for Weaver, Raymond Johnson and Richard Starr, were extremely critical of Matseas's management style, stressing his confrontational and intimidating manner. Both Johnson and Starr praised Weaver's relationship with employees, though, as Casa Gallardo observes, neither witness would have reason to be aware of some of Weaver's cited inadequacies, such as recordkeeping, failure to communicate with superiors, and insubordination. Nevertheless, Geiger, who was responsible for Weaver's review in March, 1983, testified that despite these difficulties, Weaver's performance had improved and he was expected to progress at the time immediately before the Matseas promotion.

While it is possible that the decision to promote Matseas instead of Weaver was based on a legitimate assessment of their relative abilities or commitment to excellence, given the evidence of their rough comparability as Area Supervisors, coupled with indirect evidence of possible racist contamination of the decision-making process, we cannot fault the district court for arriving at the conclusion that racial discrimination was a significant factor in the decision not to promote Weaver.

### C. *Weaver's Title VII Termination Claims*

Weaver alleged that his termination was the result of racial discrimination and in retaliation for the filing of his initial charge with the EEOC in October, 1983. The district court, although recognizing the retaliation claim, did not specifically advert to it in its liability order, and mentioned only in conclusion the claim that the termination resulted from racial discrimination. Because the two claims are closely interrelated, we will discuss them together.

■ "To establish a prima facie case of discharge in retaliation for filing charges with the EEOC, a plaintiff must show (1) statutorily protected expression, (2) adverse employment action, and (3) a causal

link between the protected expression and the adverse action."[43] Weaver unquestionably satisfies the first two elements through his filing of the charge and his ultimate termination.

■ Although the district court did not address itself to the issue, we believe that Weaver satisfied the third element as well. First, Weaver met with Casa Gallardo President Wayne Jones, Director of Operations Jim Bunting, and his supervisor, Operations Manager Ted Geiger, on July 18, 1983. Jones told Weaver that he was not going to be promoted to the new Operations–Manager position that eventually went to Matseas. It was at this same meeting that Jones made his remark about having to be wary around "articulate black men." Weaver protested the decision denying him the promotion, claiming that it was racially motivated—a protest that may be considered statutorily protected expression.[44] Shortly afterward, on September 4, 1983, Geiger gave Weaver a negative performance and development review, with a total rating of "needs improvement," which Weaver refused to sign.

More important, however, was management's behavior after Weaver's filing of the charge with the EEOC, which was communicated to Gallardo sometime after October 12, 1983. Although a meeting had already been held on October 11, before the company received notice of the charge, two participants in the meeting thereafter wrote memos to Weaver's personnel file regarding the content of the meeting. These primarily concerned Weaver's poor relations with Matseas (by then his supervisor) and his poor compliance with company reporting, paperwork, and inventory protocols. The meeting apparently ended with Weaver asking, "Why don't you just terminate me?", and Bunting informing Weaver that he had 30 days to improve in the discussed areas or he would be terminated. A follow-up meeting for October 28 was scheduled at that time, but Bunting met

**43.** *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir.1982); *see Canino v. EEOC,* 707 F.2d 468, 471 (11th Cir.1983); *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1359 n. 3, 1360 (11th Cir.1982).

**44.** *See EEOC v. White & Son Enters.,* 881 F.2d 1006, 1011–12 (11th Cir.1989).

with Weaver on October 21 and 25 instead. At about this time, Casa Gallardo began a program of intensive monitoring of Weaver's performance, in which at least one management employee was assigned to keep track of Weaver's work schedule and expense reports and regularly write memos to his personnel file. Bunting testified that Weaver was the only Area Supervisor so tracked. Bunting, Matseas, and other members of management wrote negative memos to Weaver's personnel file, Matseas writing at one point that if Weaver failed once more to show up for a regularly scheduled shift, "barring extraordinary circumstances, he should consider himself to be on notice of termination."

The pronounced increase in negative reviews and the careful scrutiny of Weaver's performance, coupled with testimony suggesting that management personnel were acutely aware of Weaver's EEOC charge, is sufficient to establish a causal link for Weaver's prima facie case of retaliatory discharge. As this court observed in *Simmons v. Camden County Board of Education*,[45]

> [T]he causal link in the [retaliatory discharge] formula [is not] the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant. Rather, we construe the 'causal link' element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.[46]

■ A prima facie case of racially discriminatory discharge is generally established by a plaintiff proving "(1) that he is a member of a protected minority, (2) that he was qualified for the job from which he was discharged, (3) that he was discharged, and (4) that his former position was filled by a non-minority."[47] The fourth element may also be satisfied by demonstrating that the plaintiff was terminated "while others not in the plaintiff's protected class, 'having comparable or lesser qualifications,' were retained,"[48] or that the plaintiff suffered from "differential application of work or disciplinary rules."[49] There is serious question as to whether Weaver fulfilled any of these requirements: he does not allege that his position was filled by a person not in his protected class, or that others committed nearly identical misconduct but were retained.[50] At best, Weaver's general allegations of unfair treatment may be read to raise the inference that others not in his protected class and of comparable or lesser qualifications were retained, despite the fact that he identified no particular individuals or qualifications. The record discloses that Matseas, for example, had been terminated for unspecified reasons approximately two months before Weaver was terminated. Because the prima-facie-case method was "never intended to be rigid, mechanistic, or ritualistic,"[51] because we review only for clear error, and because Weaver in any event retains the burden of establishing intentional racial discrimination, we need not focus unduly on Weaver's failings in this regard,[52] and turn our attention to Casa Gallardo's rebuttal and Weaver's attempt to show pretext.

■ The plaintiff's prima facie case of both retaliatory[53] and discriminatory[54] discharge may be rebutted by the defendant's proffer of legitimate, nondiscriminatory

---

**45.** 757 F.2d 1187 (11th Cir.) (per curiam), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985).

**46.** *Id.* at 1189.

**47.** *See Jones*, 680 F.2d at 101.

**48.** *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984) (quoting *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir.1980)).

**49.** *Id.* at 1185.

**50.** *See id.* at 1185.

**51.** *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

**52.** *Cf. Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir.1988).

**53.** *See Simmons*, 757 F.2d at 1189; *Walker*, 684 F.2d at 1360 n. 5; *Jones*, 680 F.2d at 101.

**54.** *See supra* note 28.

reasons for the discharge. If fully credited, the evidence Casa Gallardo adduced supporting its decision to terminate Weaver is impressive, particularly for the period subsequent to the Matseas promotion. The district court, therefore, might well have concluded that Casa Gallardo had rebutted any presumption of retaliation or discrimination raised by Weaver's prima facie cases. But it did not. The issue, therefore, is whether the record is so lacking in support for the district court's judgment that we must reverse it.

Weaver introduced exhibits praising certain aspects of his management of restaurants under his supervision. He also introduced evidence that he was at least minimally competent.

The actual decision to terminate Weaver was made by David Lane, Casa Gallardo's Vice President of Operations. While Weaver does not suggest that Lane, to whom he attributed sole responsibility for the termination decision, had made any racist comments, had been involved in any social exclusion of Weaver, or was himself racially insensitive, the district court might well have concluded that he was influenced by Jones, Bunting, and Geiger in making his decision to terminate Weaver, and may in particular have been influenced by their racism or desire to retaliate against Weaver for filing the EEOC charge. Lane admitted discussing the charge with all three men and with others in the Casa Gallardo organization, although he denied any negative influence on his decision. Given the lengthy record and the credibility choices necessary to properly evaluate the testimony, we conclude that the district court had sufficient evidence to support its finding of pretext.

### III.

The award of damages must be based solely on the authority of Title VII. The purpose of Title VII relief is to "make whole" victims of unlawful discrimination.[55] To accomplish this purpose, the statute "vests broad equitable discretion in the federal courts,"[56] to fashion the "most complete relief possible."[57] We review each of the separate items of damage assessed by the district court.

### A. Back Pay

■ Weaver sought back pay at the operations-manager-salary level from his termination date in April, 1984, up to the date of trial. Having found that Casa Gallardo discriminated against him, Weaver is "presumptively entitled to back pay."[58]

Casa Gallardo contends that Weaver is not entitled to any back pay award or damages. It first asserts that Weaver sought only promotion to the Operations–Manager position awarded to Matseas. That position, Casa Gallardo argues, was eliminated by David Lane in a corporate reorganization. The district court, however, determined in the first phase of the trial that Weaver had applied for and was unlawfully denied the operations manager position awarded Geiger as well as the position awarded Matseas. The position held by Geiger was never eliminated.

■ Casa Gallardo next contends that the sale of its assets to the El Torito restaurant chain in November, 1985, severs all of its back pay liability as of that date. The sale of corporate assets to a successor corporation does not necessarily limit the predecessor corporation's liability for back pay subsequent to the sale. Indeed, a Title VII plaintiff may be barred from seeking back-pay liability from a successor corporation if the predecessor corporation is fully able to provide relief.[59] The employer's liability should be based on the extent to which its illegal action "proximately cause[d] plaintiff's damages."[60]

**55.** *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1979).

**56.** *Franks v. Bowman Transportation Company,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976).

**57.** *Albermarle,* 422 U.S. at 421, 95 S.Ct. at 2373.

**58.** *Nord v. U.S. Steel Corp.,* 758 F.2d 1462, 1472 (11th Cir.1985).

**59.** *Brown v. Evening News Ass'n,* 473 F.Supp. 1242, 1245 (E.D.Mich.1979).

**60.** *Sivell v. Conwed Corp.,* 666 F.Supp. 23, 26 (D.Conn.1987).

■ As we noted in *Nord v. U.S. Steel Corporation*,[61] the victim of discrimination is "entitled to whatever employment opportunities the other [employees] were given...." The district court correctly observed that Title VII should not put the prevailing claimant in a better position than similar employees who were not discriminated against, but conversely he should not be disadvantaged. Instead, he should be restored to or compensated for the employment opportunities that were available to other management personnel at Casa Gallardo.

When General Mills sold the assets of Casa Gallardo to the El Torito chain, those Casa Gallardo employees working in Operations–Manager positions, including Geiger, as well as many other employees, transferred to and were employed by El Torito. The record thus supports the district court's conclusion that, had Weaver held the position of Operations Manager at the time of the sale to El Torito, he would have been transferred in that position to El Torito.

■ Casa Gallardo also asserts that, in any event, Weaver failed to mitigate his damages by using reasonable diligence to find substantially equivalent employment. Title VII requires that "interim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the back pay otherwise allowable...."[62] Weaver, therefore, had a duty to seek employment "substantially equivalent" to the Operations–Manager positions he was denied.[63] "Substantially equivalent employment" is employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status to those available to employees holding the position from which the Title VII claimant has been discriminatorily terminated.[64] If the former employee cannot find substantially equivalent employment, he may "lower his sights" and accept non-comparable employment. Title VII, however, "does not require that a person remain employed despite dissatisfaction."[65]

■ Casa Gallardo has the burden of showing that Weaver did not make reasonable efforts to obtain work.[66] Specifically, the employer must show that "comparable work was available and the claimant did not seek it out."[67] If, however, "an employer proves that the employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially comparable employment."[68]

The district court found that Weaver did not earnestly begin looking for a substantially similar position in the restaurant industry until September of 1985, but that he then diligently began seeking work in the hospitality and restaurant industries in Atlanta. Weaver thereafter took reasonable steps to look for a managerial position in the restaurant industry substantially equivalent to his job at Casa Gallardo, but could not find such work. He therefore took a non-equivalent management trainee position with Pizza Inn at a salary of $26,000.00 a year. Weaver testified, however, that he was forced to leave that job and move home to Detroit after six months because of financial pressures and old debts. Since that time plaintiff has been employed selling tile, a job paying far less than Casa Gallardo. The district court held that Weaver had failed to reasonably mitigate his damages during the period between May, 1984, through September, 1985, and that this failure should simply reduce the damages awarded by the amount Weaver could have earned.

■ Casa Gallardo contends that the management-trainee position at Pizza Inn

---

**61.** 758 F.2d at 1473 n. 11.

**62.** 42 U.S.C. § 2000e–5(g) (1988).

**63.** *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1510 (11th Cir.1987).

**64.** *Sellers v. Delgado Community College*, 839 F.2d 1132, 1138 (5th Cir.1988).

**65.** *Guardian Pools*, 828 F.2d at 1511.

**66.** *Sellers*, 839 F.2d at 1139.

**67.** *Id.*

**68.** *Id.*

was a "substantially comparable" position that Weaver should not have left. The district court held that the management-trainee position was not "virtually identical" to the operations manager position at Casa Gallardo, and that Weaver was justified in leaving that position and moving to Detroit because of financial pressures. It held, therefore, that Weaver did not forfeit his right to back pay because of his resignation from Pizza Inn. These findings were not in error.

Accordingly, the district court held that Weaver should receive back pay (salary and bonuses) until the date of the judgment, December 31, 1988, deducting the amounts by which he might have mitigated his damages and his actual interim earnings, accumulated from April 1984, computed as follows:

| | | | |
|---|---|---|---|
| 1984 | $50,409 − $29,368 | = | $21,041 |
| 1985 | $62,600 − $26,000 | = | $36,600 |
| 1986 | $59,389 − $13,124 | = | $46,265 |
| 1987 | $62,778 − $17,225 | = | $45,563 |
| 1988 | $63,892 − $21,384 | = | $42,508 |

The court also awarded Weaver the following damages for other benefits that he lost during this period:

| | Social Security | Car Allowance | Profit Sharing | Total |
|---|---|---|---|---|
| 1984 | $1,804 | $2,000 | $735 | $ 4,539 |
| 1985 | $2,792 | $3,000 | $843 | $ 6,635 |
| 1986 | $2,065 | $3,000 | –0– | $ 5,065 |
| 1987 | $1,900 | $3,000 | –0– | $ 4,900 |
| 1988 | $2,153 | $3,000 | –0– | $ 5,153 |
| | | TOTAL | | $26,292 |

The total back pay award amounted to $218,259. The court also awarded Weaver lost retirement benefits, which it calculated at present value to be $12,713, and prejudgment interest, calculated pursuant to the IRS adjusted prime rates, and compounded annually.[69] The prejudgment interest thus calculated is $41,815.58. Considering our disallowance of front pay, we think the back pay award achieves substantial justice and equity and accomplishes the purposes of Title VII.

**B. Reinstatement and Front Pay**

In addition to back pay, prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay.[70] This right was not terminated by the sale of Casa Gallardo's assets for, as with back pay, Casa Gallardo's failure to promote or retain Weaver was the proximate cause of his not being transferred along with the other management personnel when Casa Gallardo was sold. The district court held that reinstatement was not appropriate because Weaver neither requested nor presented evidence of successor liability.[71]

**69.** *McKelvy v. Metal Container Corp.,* 854 F.2d 448, 453 (11th Cir.1988); *see also Delaney v. Tanzler,* 34 Empl.Prac.Dec. (CCH) p 34,349 (M.D.Fla.1984); *EEOC v. Local 638,* 674 F.Supp. 91, 105 (S.D.N.Y.1987).

**70.** *Nord,* 758 F.2d at 1473.

**71.** *See discussion In re National Airlines, Inc.,* 700 F.2d 695 (11th Cir.) *cert. denied sub nom. Gardner v. Pan American World Airways, Inc.,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983).

While the sale of Casa Gallardo did not automatically preclude reinstatement with General Mills, Casa Gallardo's parent company, there was no evidence that substantially equivalent positions were available in the General Mills restaurant group. Accordingly, the district court found front pay appropriate for "rectifying the harm" that defendant's discrimination caused Weaver.[72]

The district court found that Weaver had established base-year damages of $53,435 per year and that it would "be quite hard, if not impossible," for Weaver to obtain the "substantially equivalent position" of Operations Manager in a restaurant. Considering Weaver's experience with Red Lobster and Casa Gallardo, however, Weaver should have been able, with diligent effort and pursuit of the position, to work up into a higher management position within the restaurant field during a three year period following 1988. The district court therefore found that he was entitled to an additional three years of front pay at $53,435 a year.

■ Back pay and front pay are not independent and severable items of damages. They are each part of the remedy the court is charged with fashioning, a remedy that, as a whole, achieves the remedial purposes of the Act. A monetary award of front pay is calculated to terminate on the date a victim of a discrimination attains an opportunity to move to his "rightful place."[73] Front pay, therefore, is appropriate only when the other damages awarded will not fully compensate the plaintiff for his injury.[74]

The district court did not state any reason why, within the period beginning in September, 1985, and ending in 1988, Weaver should not have been able to work his way up from management trainee to a supervisory position. The allowance of back pay for 1986, 1987, and 1988 deducted a modest amount for failure to mitigate damages. Taking this into account, we see no reason to award him front pay in addition.

## C. *Compensatory Damages*

■ The court awarded compensatory damages pursuant to § 1981 for the emotional distress suffered as a result of Casa Gallardo's conduct.[75] Because Title VII authorizes relief based principally on equitable principles, such damages are not allowable under that Act.[76] No award under § 1981 can be made unless the district court finds the failure to promote constituted a violation of that statute, and, if so, the award must be limited to the damages suffered as a result of the failure to promote. Accordingly, the court on remand shall determine whether any award should be made, and, if so, its amount.

## D. *Attorney's Fees*

The district court awarded Weaver's attorneys fees. Weaver does not seek an additional award for attorney's services on appeal, and Casa Gallardo does not contest the amount awarded for trial-court services, seeking vacation of the award only on the basis that the district court incorrectly decided the liability issues. We therefore affirm the judgment insofar as it awarded attorney's fees.

For the reasons stated, we:

1. AFFIRM the judgment of liability under Title VII for both of Weaver's failure to promote claims and for his claim of retaliatory and discriminatory discharge;

2. REVERSE the district court's judgment of liability under Section 1981;

3. REMAND to the district court to reevaluate the question of liability under Section 1981 for the failure-to-promote claims;

4. AFFIRM the award of back pay;

---

**72.** *Nord,* 758 F.2d at 1474.

**73.** *James v. Stockham Valves and Fittings Co.,* 559 F.2d 310, 358 (5th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

**74.** *Dillon v. Coles,* 746 F.2d 998 (3rd Cir.1984); *Rengers v. W.C.L.R. Radio Station,* 44 F.E.P. Cases 1287, 1986 WL 3033 (N.D.Ill.1986).

**75.** *Gore v. Turner,* 563 F.2d 159 (5th Cir.1977).

**76.** *E.g., Walker v. Ford Motor Co.,* 684 F.2d 1355, 1364 (11th Cir.1982).

5. AFFIRM the award for lost retirement benefits and prejudgment interest;

6. VACATE the award of front pay;

7. VACATE the award of compensatory damages; and

8. AFFIRM the award of attorney's fees.

The case is REMANDED for further proceedings consistent with this opinion.

CLARK, Circuit Judge, specially concurring:

I cannot concur in the majority's conclusion that the Supreme Court's holding in *Patterson v. McLean Credit Union*[1] compels our court to determine that discriminatory discharges of employees by employers are not covered by 42 U.S.C. § 1981. *Patterson* held that racial harassment in the workplace is conduct not covered by the statute. The case did not involve a discriminatory discharge.[2]

The Court in *Patterson*, as a prelude to deciding the issue before it, reconsidered its opinion and holding in *Runyon v. McCrary*[3] and adhered to it. *Runyon* had considered whether private schools holding themselves out to the public as accepting students for compensation could for racial reasons refuse to contract for admission of students. The Supreme Court held that section 1981 authorized a cause of action by parents that exclusion of their children from a private school could not be based on race. The Court in the course of deciding *Runyon* said:

> The prohibition of racial discrimination that interferes with the making and enforcement of contracts for private educational services furthers goals closely analogous to those served by § 1981's elimination of racial discrimination in the making of private employment contracts and, more generally, by § 1982's guarantee that "a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man."[4]

*Patterson* follows *Runyon* and holds that "a refusal to enter into an employment contract on the basis of race ... would be actionable under § 1981 as an impairment of 'the same right ... to make ... contracts ... as ... white citizens,' 42 U.S.C. Sec. 1981."[5]

It defies commonsense and logic to hold that section 1981 permits an action for a discriminatory refusal to hire and then deny an action for a discriminatory discharge. Consider, for example, what would have occurred in *Runyon* if the defendant private schools had enrolled minority students pursuant to the court order and then discharged them from the school two months later for reasons of race. Would the parents upon return to the court be told that section 1981 did not authorize a suit for discriminatory dismissal? The statute specifically prohibits discrimination in the making and enforcement of contracts. It stands to reason that since schools and employers are forbidden from refusing to make contracts (admitting children to schools or hiring employees) for racial reasons, a person discriminated against in either of these contexts can enforce the contract under section 1981 in the

**1.** 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

**2.** Our court has not fully considered whether a discharge from employment based on race is or is not cognizable under 42 U.S.C. § 1981. In *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1534 (11th Cir.1990), a panel held that Sherman's former employer, Burke Contracting, Inc., would not be liable to Sherman under § 1981 for causing Sherman's subsequent employer, Palmer, to discharge him. Our court properly held that this was a post-contractual retaliatory claim not covered by the statute. Our court in a non-argument calendar two-paragraph opinion, *Thompkins v. DeKalb County Hospital Authority*, 916 F.2d 600 (11th Cir.1990), held that the district court was correct in deny-

ing plaintiff's discharge claim on a summary judgment ground or in the alternative that it was foreclosed by *Patterson*. I recognize that the majority can consider itself bound by these decisions. However, absent a Supreme Court decision, our full court should decide this issue in light of the *Johnson v. Railway Express Agency, Inc.* decision discussed *infra*.

**3.** 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

**4.** 427 U.S. at 179, 96 S.Ct. at 2599 (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 443, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968)).

**5.** 491 U.S. at ——, 109 S.Ct. at 2375.

event of a termination of the contract for racial reasons.

The Supreme Court in *Patterson* specifically recognizes this, acknowledging that:

after *Runyon*, there is some necessary overlap between Title VII and § 1981, and that where the statutes do in fact overlap we are not at liberty "to infer any positive preference for one over the other." [6]

It must be remembered that *Johnson*, cited by the Supreme Court in the reference above, included a claim by the plaintiff of a discriminatory discharge from employment. The Supreme Court unanimously stated:

Despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief. "[T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." *Alexander v. Gardner–Denver Co.*, 415 U.S., at 48, 94 S.Ct., at 1019. In particular, Congress noted "that the remedies available to the individual under Title VII are co-extensive with the indiv[i]dual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive." H.R.Rep. No. 92–238, p. 19 (1971), *U.S. Code Cong. & Admin. News*, 1972, pp. 2137, 2154. *See also* S.Rep. No. 92–415, p. 24 (1971). Later, in considering the

equal Employment Opportunity Act of 1972, the Senate rejected an amendment that would have deprived a claimant of any right to sue under § 1981. 118 *Cong.Rec.* 3371–3373 (1972).[7]

The Court in *Patterson* briefly discussed *Johnson* but at no point overruled it. The Court in *Patterson* specifically held only that racial harassment was not cognizable under section 1981. When the Supreme Court does not overrule one of its prior precedents, are we authorized to do so? I would hold not. When Weaver filed this lawsuit, *Johnson* authorized it and *Johnson* is still the law. We are controlled by that decision.[8]

---

**6.** 491 U.S. at ——, 109 S.Ct. at 2375 (citing *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 458–59, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975)).

**7.** *Johnson,* 421 U.S. at 459, 95 S.Ct. at 1719.

**8.** In so concluding, I acknowledge that at least five other circuits have held that *Patterson* applies to bar cases of discriminatory discharge. *See Barringer v. AT & T Technologies, Inc.,* 902 F.2d 27 (4th Cir.1990) (table); *Carroll v. General Accident Ins. Co.,* 891 F.2d 1174, 1175 n. 1 (5th Cir.1990); *Lavendar v. V & B Transmissions & Auto Repair,* 897 F.2d 805 (5th Cir.1990); *Carter*

*v. South Central Bell Telephone Co.,* 912 F.2d 832 (5th Cir.1990); *Christian v. Beacon Journal Publishing Co.,* 908 F.2d 972 (6th Cir.1990) (table); *McKnight v. General Motors Corp.,* 908 F.2d 104 (7th Cir.1990); *Courtney v. Canyon Television & Appliance Rental, Inc.,* 899 F.2d 845, 849 (9th Cir.1990); *Overby v. Chevron U.S.A. Inc.,* 884 F.2d 470, 472–73 (9th Cir.1989). Only the Eighth Circuit has held that a plaintiff can state a claim for discriminatory discharge under section 1981, *Hicks v. Brown Group, Inc.,* 902 F.2d 630, 635 (8th Cir.1990), and a separate Eighth Circuit panel has questioned that result. *See Taggart v. Jefferson County Child Support Enforcement Unit,* 915 F.2d 396 (8th Cir.1990).